Filed 1/23/15

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSE VARGAS, | B246660 |
|     Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC459827) |
| FMI, INC., et al., | |
|     Defendants and Respondents. | |

      APPEALS from judgments of the Superior Court of Los Angeles County, Joseph R. Kalin, Judge. Judgments in favor of FMI, Inc. and Eves Express, Inc., reversed.

      Law Offices of Bernardo De La Torre, Bernardo De La Torre and Ronald A. Martinetti for Plaintiff and Appellant.

      Wood, Smith, Henning & Berman, David F. Wood and Steven L. Rodriguez for Defendants and Respondents.

_____

*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, **[[ ]]**.

Jose Vargas (Vargas or plaintiff) and Luis Felipe Villalobos (Villalobos) were a two-man team driving a tractor-trailer across the country. Villalobos was driving and Vargas was in the sleeper berth when the tractor-trailer rolled over, injuring Vargas. Vargas sued FMI, Inc. (FMI) (the motor carrier and trailer owner), Eves Express, Inc. (Eves) (the tractor owner), Eswin Suchite (Suchite) (Eves's principal), and Villalobos (the driver), for negligence. The trial court granted summary judgment for FMI and Eves, concluding as a matter of law that neither was vicariously liable for Villalobos's alleged negligence.

Vargas appeals, contending that: (1) as a federally licensed motor carrier, FMI owed him a nondelegable duty of care and is vicariously liable for Villalobos's negligence; and (2) Eves is vicariously liable for Villalobos's negligence under Vehicle Code section 17150 (vehicle owner is liable for negligence of permissive user). FMI and Eves respond that: (1) under *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), a hirer (FMI) is not vicariously liable for the negligence of a person (Villalobos) hired by an independent contractor (Eves); and (2) Eves is not vicariously liable for the negligence of Villalobos under the Graves Amendment, 49 United States Code section 30106(a).

We reverse. *Privette* and its progeny have never been applied to a case like the present one, where the basis for vicarious liability is alleged to be a "franchise granted by public authority" (Rest. 2d Torts, § 428)—here, a federal motor carrier's license.[1] Moreover, federal law requires motor carriers using leased vehicles to "have control of and be responsible for" such vehicles (49 U.S.C. section 14102) in order to "protect the public from the tortious conduct of the often judgment-proof truck lessor operators" (*Amerigas Propane, LP v. Landstar Ranger, Inc.* (2010) 184 Cal.App.4th 981, 994-995). Finally, defendants have not established as a matter of undisputed fact that the tractor's owner is entitled to the protection of the so-called Graves Amendment, 49 U.S.C. section 30106, subdivision (a), which shields owners of leased vehicles "engaged in the business

---

[1] Restatement (Second) of Torts, section 428, has been adopted in California. (See, e.g., *Serna v. Pettey Leach Trucking, Inc.* (2003) 110 Cal.App.4th 1475, 1484 (*Serna*)).

2

or trade of renting or leasing motor vehicles" from vicarious liability for the alleged negligence of their lessee's drivers. Accordingly, the trial court erred in granting defendants' motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Tractor/Trailer Accident

FMI is a federally licensed motor carrier that operates a shipping distribution center in San Pedro, California. It arranges transportation of goods for its customers by hiring contractors, sometimes called "owner/operators," who lease their tractors and drivers to FMI. Eves, owned by Suchite, is one such owner/operator.

In January 2010, FMI was retained to deliver cargo from California to New Jersey. FMI selected Eves's tractor and two of Eves's drivers, plaintiff and Villalobos, to make the trip. Plaintiff and Villalobos drove the tractor to FMI's yard in San Pedro, California, connected the tractor to a trailer, and then departed for New Jersey.

About four hours into the drive, while plaintiff was asleep in the tractor's sleeping berth, Villalobos lost control of the tractor-trailer. The vehicle hit a center divider and rolled over, injuring plaintiff.

### II.     The Complaint

Plaintiff filed a complaint in April 2011 alleging a single cause of action for negligence against FMI, Eves, Suchite, and Villalobos, among others. The complaint alleges as follows:

"9.     On January 20, 2010, Plaintiff Jose Vargas was a passenger in the cab of a tractor-trailer driven by Defendant Luis Felipe Villalobos. Plaintiff was lawfully in the cab and was asleep when Defendant Villalobos apparently nodded off and lost control of the truck which swayed out of its lane and smashed into the center median (in violation of Vehicle Code section 21658(a) – unsafe lane change.) At the time of the crash, Defendant had been driving east on Interstate 40 in San Bernardino carrying a load of garments to New Jersey. Plaintiff is informed and believes that Defendants FMI, Inc. and

3

Summit Logistics International are experienced providers of integrated logistics and freight forwarding services for the national garment industry.

"10. Plaintiff is informed and believes that Defendant FMI, Inc. . . . was operating the vehicle under a public franchise and was subject to regulations enacted for the protection of the public (such as Plaintiff Vargas). All Defendants, including FMI, Inc. and Eves Express, Inc. were under a nondelegable duty to Plaintiff (and other members of the public) and so were liable for the negligence of Defendant Villalobos in seriously injuring Plaintiff (who has to date over $50,000 in medical bills).

"11. Plaintiff is further informed and believes and upon that basis alleges that all Defendants were engaged in interstate commerce and were regulated by statute and that they were each vicariously responsible for Defendant Villalobos's negligence under regulations and written lease agreements and/or under the doctrine of placard liability.[2] Moreover, Plaintiff is informed and believes that Defendant Eves Express, Inc. and Eswin Saul Suchite (as well as other Defendants) failed to properly train, monitor, and supervise Defendant Villalobos and that had he been properly trained and monitored he would not have fallen asleep at the wheel of the truck and rolled it over.

"12. Defendants and each of them had a duty whether common law or statutory not to injure Plaintiff and they breached that duty by the careless and negligent acts set forth in paragraphs 9 through 11. Defendants[] and each of their breaches caused direct harm to the Plaintiff including loss of income and other damages that shall be proven up at trial or added by amendment upon leave of Court."

---

[2] " 'Placard Liability' "—also called 'logo liability'—'operates to hold federally authorized carriers . . . that are licensed by the United States Department of Transportation (USDOT) and display their USDOT certificate number on their trucks, vicariously liable for the negligence of drivers operating under a lease.' [Citations.] The point of 'placard liability'—and, indeed, of the Interstate Commerce Act—'is to make a carrier under the Act liable for those injuries caused to the traveling public which arise out of the [negligent] operation of any vehicle leased to it and operated under its ICC permit.' " (*National American Insurance Company v. Progressive Corporation*, __ F.Supp.2d __, 2014 U.S.Dist. Lexis 67180 (N.D. Ill. May 15, 2014).)

4

**III. Defendants' Motion for Summary Judgment**

FMI and Eves filed a motion for summary judgment in July 2012. They asserted that plaintiff was an independent contractor, not an employee, of FMI and Eves. As such, neither FMI nor Eves owed plaintiff a duty to provide a safe workplace. They contended: "FMI and Eves Express implicitly delegated all workplace safety responsibilities and tort liability to Plaintiff, an independent contractor, with regard to workplace safety issues. Under California law (*SeaBright Ins. Co. v. US Airways*, *supra*), this delegation is implicit and presumed in contracts entered into between hirers (FMI and Eves Express) and independent contractors (Plaintiff). . . . As a result of the implied and presumed delegation of workplace safety recognized under *SeaBright Ins. Co. v. US Airways*, *supra*, FMI and Eves Express owed no duty of care to Plaintiff. Therefore, Plaintiff cannot prove a prima facie case of Negligence against FMI and Eves Express, and FMI and Eves Express are entitled to judgment as a matter of law."

Plaintiff opposed the summary judgment motion. He admitted that he was an independent contractor of FMI and Eves, but contended that his negligence claim against FMI was properly analyzed under the "nondelegable duty" doctrine. Under that doctrine, because FMI is a federal motor carrier regulated by the Department of Transportation and state law, it cannot delegate its responsibility to the public by characterizing its drivers as independent contractors. Accordingly, FMI is liable to members of the public for the negligence of its drivers, including Villalobos. Plaintiff also contended that Eves was liable for Villalobos's negligence pursuant to Vehicle Code section 17150 because Villalobos was a permissive user of Eves's truck.

In opposition to the motion, plaintiff submitted FMI's responses to requests for admissions, in which FMI admitted that the Motor Vehicle Lease Agreement between it and Suchite incorporated language required by federal regulation (49 C.F.R. § 376.12), and further admitted that it operated pursuant to a Contract Carrier Permit issued to it by the U.S. Department of Transportation (Federal Motor Carrier Safety Administration), DOT No. 1125882. Further, in response to discovery, FMI produced a "Motor Carrier

Identification Report" that identified it as an Interstate Carrier Authorized For Hire. In the most recent calendar year, it owned 184 truck tractors and 506 trailers, "trip leased" 165 truck tractors, and employed or contracted with 349 drivers for interstate and intrastate trips. FMI carried a Motor Carrier Policy of Insurance for Public Liability, with limits of $2,000,000 per accident. FMI admitted that it was a "motor carrier of property" as defined in Vehicle Code section 34601.

In their reply papers, FMI and Eves asserted that plaintiff was a co-driver, not a member of the "motoring public," and thus was not entitled to the protections of the nondelegable duty doctrine. Further, Eves asserted that Vehicle Code section 17150 was preempted by the federal Graves Amendment, 49 United States Code section 30106, which abolished vicarious liability for owners of leased vehicles in some circumstances.

The trial court granted defendants' summary judgment motion. Its order said: "The issue before the court is whether defendants owed a legal duty to plaintiff. Plaintiff is a self-professed independent contractor as was the driver Luis Felipe Villalobos. A hir[er] cannot be held liable for injuries to an independent contractor. (*Privette v. Superior Court*[, *supra*,] 5 Cal.4th 689.) In (*SeaBright v. US Airways*[, *supra*,] 52 Cal.4th 590) the Supreme Court extended *Privette* to service contracts, [holding] that the duty to provide a safe working environment is implicitly and presumptively delegated in all independent contractor agreements. Also see (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198)."

The trial court entered judgment for FMI on December 4, 2012, and for Eves on January 28, 2013. Vargas timely appealed.

## STANDARD OF REVIEW

A court may grant summary judgment only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) The defendant can satisfy its burden by presenting

6

evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to establish an essential element. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 (*Miller*).) If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review the trial court's ruling on a summary judgment motion de novo, and liberally construe the evidence and resolve all doubts concerning the evidence in favor of the party opposing the motion. (*Miller*, *supra*, 26 Cal.4th at p. 460.) We must affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the trial court's stated reasons. (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181.)

## APPEAL—JUDGMENT FOR FMI

FMI urges that under the California Supreme Court's decisions in *Privette*, *supra*, 5 Cal.4th 689, *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518 (*Tverberg*), and *SeaBright*, *supra*, 52 Cal.4th 590, an entity such as FMI (the "hirer") that hires an independent contractor implicitly delegates to the independent contractor any tort law duty it owes the independent contractor or the independent contractor's employees to ensure workplace safety. Accordingly, because Eves, Villalobos, and plaintiff were independent contractors, FMI did not owe them a duty to provide a safe workplace, and thus it cannot be liable for plaintiff's injuries.

Plaintiff disagrees. Although he concedes his independent contractor status, he contends that under established law, because FMI was operating under a public franchise (i.e., a federal motor carrier permit), it had a nondelegable duty to safely operate the trucks driven for its benefit. Accordingly, FMI is liable to plaintiff for the negligence of Eves and/or Villalobos without regard to their status as employees or independent contractors.

In the sections that follow, we discuss the doctrines of "peculiar risk" and "nondelegable duty" as they apply to a hirer's vicarious liability for injuries caused by the

7

workplace negligence of an independent contractor.[3]  We then consider the federal Motor Carrier Act (the Act), 49 United States Code section 13101 et seq., under which FMI operated, as well as federal and state cases that discuss whether the Act's protections extend to drivers classified as independent contractors.[4]  Finally, we apply these doctrines to conclude that on the present record, FMI has not demonstrated that it delegated to Eves, Villalobos, and plaintiff the duty to ensure a safe workplace, and thus FMI is not entitled to summary judgment.

## I.  California Law Governing Vicarious Liability for Injuries Caused by the Negligence of an Independent Contractor

We begin by discussing California law governing a hirer's vicarious liability for injuries caused by the negligence of an independent contractor.  At common law, a person who hired an independent contractor to perform a task generally was not liable to third parties for injuries caused by the independent contractor's negligence.  Central to this rule of nonliability " 'was the recognition that a person who hired an independent contractor had " 'no right of control as to the mode of doing the work contracted for.' " ' " (*SeaBright*, *supra*, 52 Cal.4th at p. 598.)  Although that was the common law rule, " '[o]ver time, the courts . . . created so many exceptions to this general rule of nonliability that " ' "the rule [came to be] primarily important as a preamble to the catalog of its exceptions." ' " ' " (*Ibid*.)  Two such exceptions are relevant here:  the doctrines of peculiar risk and nondelegable duties.

### A.  *The Peculiar Risk Doctrine*

The doctrine of peculiar risk is an exception to the common law rule that a hirer was not liable for the torts of an independent contractor.  Under this doctrine, "a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work

---

[3]  Because all parties take the position that plaintiff and Villalobos were independent contractors, we assume their independent contractor status for purposes of this opinion.

[4]  All subsequent undesignated statutory references are to the Act.

8

causes injuries to others. By imposing such liability without fault on the person who hires the independent contractor, the doctrine seeks to ensure that injuries caused by inherently dangerous work will be compensated, that the person for whose benefit the contracted work is done bears responsibility for any risks of injury to others, and that adequate safeguards are taken to prevent such injuries." (*Privette*, *supra*, 5 Cal.4th at p. 691.) This doctrine of peculiar risk thus represents a limitation on the common law rule and a corresponding expansion of hirer vicarious liability.

In its 1993 decision in *Privette*, *supra*, 5 Cal.4th 689, 691, the California Supreme Court limited the peculiar risk doctrine as it applied to injured employees of independent contractors. *Privette* concerned a roofing contractor's employee who was injured when he fell off a ladder and was burned by hot tar. The employee sued the owner of the home he had been roofing, contending that the homeowner was liable for his injuries under the doctrine of peculiar risk. (*Id.* at pp. 692-693.) The Supreme Court disagreed, concluding that while the homeowner would be liable to an "innocent bystander" (*id.* at p. 701) injured by the independent contractor's negligence, he was *not* liable to an independent contractor's employee. The court explained: "[T]he peculiar risk doctrine seeks to ensure that injuries caused by contracted work will not go uncompensated, that the risk of loss for such injuries is spread to the person who contracted for and thus primarily benefited from the contracted work, and that adequate safety measures are taken to prevent injuries resulting from such work. [Citation.] But in the case of on-the-job injury to an employee of an independent contractor, the workers' compensation system of recovery regardless of fault achieves the identical purposes that underlie recovery under the doctrine of peculiar risk. It ensures compensation for injury by providing swift and sure compensation to employees for any workplace injury; it spreads the risk created by the performance of dangerous work to those who contract for and thus benefit from such work, by including the cost of workers' compensation insurance in the price for the contracted work; and it encourages industrial safety." (*Privette*, *supra*, at p. 701.) Thus, the court concluded, "when considered in light of the various goals that the workers'

9

compensation statutes seek to achieve, [the conclusion] that peculiar risk liability should extend to the employees of the independent contractor, does not withstand scrutiny." (*Id.* at pp. 701-702.)[5]

In 2010, in *Tverberg*, *supra*, 49 Cal.4th 518, the court expanded the *Privette* doctrine (and thus reduced the scope of hirer liability) to hold that a general contractor is not vicariously liable to an independent contractor hired by a subcontractor for jobsite injuries on a theory of peculiar risk. The court explained: "When an independent contractor is hired to perform inherently dangerous construction work, that contractor, unlike a mere employee, receives authority to determine how the work is to be performed and assumes a corresponding responsibility to see that the work is performed safely. The independent contractor receives this authority over the manner in which the work is to be performed from the hirer by a process of delegation. This delegation may be direct, when the hirer has contracted with the independent contractor, or indirect, when the hirer contracts with another contractor who then subcontracts the work to the independent contractor. [Citations.] Whether direct or indirect, this delegated control over the performance of the work removes the independent contractor from the category of 'innocent third parties' deserving of financial protection under the doctrine of peculiar risk. As this court stressed in *Kinsman* [*v. Unocal Corp.* (2005)] 37 Cal.4th 659, when the hirer of an independent contractor delegates control over the work to the contractor, the hirer also delegates 'responsibility for performing [the] task safely.' [Citations.] Therefore, a hired independent contractor who suffers injury resulting from risks inherent in the hired work, after having assumed responsibility for all safety precautions

---

[5] Following *Privette*, the Supreme Court issued several decisions discussing the peculiar risk doctrine as it applied to employees of independent contractors. In *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 (*Toland*), the court held that the hirer of an independent contractor was not liable to the contractor's employee for failing to specify that the contractor should take special precautions to avert a peculiar risk. In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, the court held that an independent contractor's employees may recover from the contractor's hirer if the hirer retained control of the work and failed to exercise its control with reasonable care.

10

reasonably necessary to prevent precisely those sorts of injuries, is not, in the words of *Privette*, *supra*, at page 694, a 'hapless victim' of someone else's misconduct. In that situation, the reason for imposing vicarious liability on a hirer—compensating an *innocent third party* for injury caused by the risks inherent in the hired work—is missing.

"As noted earlier, a hirer's liability under the doctrine of peculiar risk is *vicarious*. (*Privette*, *supra*, 5 Cal.4th at p. 695 & fn. 2.) This means that, irrespective of the hirer's lack of negligence, the hirer incurs liability for the hired contractor's act or omission in failing to use reasonable care in performing the hired work. (*Toland*, *supra*, 18 Cal.4th at p. 265.) And in hiring an independent contractor to perform work that presents some inherent risk of injury to others, the hirer delegates responsibility over the work to the contractor. (See *Kinsman*, *supra*, 37 Cal.4th at p. 671.) It would be anomalous to allow an independent contractor to whom responsibility over the hired work has been delegated to recover against the hirer on a peculiar risk theory while denying such recovery to an independent contractor's *employee*, a person who lacks any authority over the hired work." (*Tverberg*, *supra*, at p. 528.)

B.      *The Nondelegable Duties Doctrine*

The nondelegable duties doctrine, another exception to the common law rule of hirer nonliability, "prevents a party that owes a duty to others from evading responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work." (*SeaBright*, *supra*, 52 Cal.4th at pp. 600-601.) As relevant here, the Restatement Second of Torts describes two kinds of nondelegable duties:

(1) <u>Section 424</u> (Precautions Required by Statute or Regulation) (section 424): "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." (*See Evard v. Southern California Edison* (2007) 153 Cal.App.4th 137, 146.)

11

(2)  Section 428 (Contractor's Negligence in Doing Work Which Cannot Lawfully Be Done Except Under a Franchise Granted to His Employer) (section 428):  "An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity."  (See *Serna*, *supra*, 110 Cal.App.4th at p. 1484.)

In 1952, the California Supreme Court applied the nondelegable duty doctrine to find a motor carrier liable for the negligence of its independent contractor in *Eli v. Murphy* (1952) 39 Cal.2d 598.  There, the plaintiffs were injured when their car was hit by a tractor-trailer owned by Leo Murphy and driven by James Murphy.  At the time of the accident, the Murphys were transporting freight under a contract with California Motor Transport Co. (C.M.T.), a motor carrier (then called a "highway common carrier") licensed by the California Public Utilities Commission.[6]  Plaintiffs sued the Murphys and C.M.T., and the trial court instructed the jury that if it found James liable to the plaintiffs, it should also find Leo and C.M.T. liable.  (*Id.* at pp. 598-599.)

C.M.T. appealed from the resulting verdict against it, contending that because Leo was an independent contractor, it was not liable for the negligence of Leo's driver/employee.  The Supreme Court disagreed.  Citing section 428 of the Restatement Second of Torts (work performed under a public franchise), the court noted that C.M.T., operating as a highway common carrier, "is engaged in a 'business attended with considerable risk' [citations], and the Legislature has subjected it and similar carriers to

---

[6]     Prior to the passage of the Motor Carriers of Property Permit Act (Veh. Code, § 34600 et seq.), commercial vehicle operators were called "highway common carriers" and were regulated by the Public Utilities Commission.  Under current state law, a person who operates a commercial motor vehicle is a "motor carrier of property" and is subject to regulation by the Department of Motor Vehicles and the California Highway Patrol. (See *Hill Brothers Chemical Co. v. Superior Court* (2004) 123 Cal.App.4th 1001, 1005-1006; Veh. Code, § 34601, subd. (a).)

12

the full regulatory power of the Public Utilities Commission to protect the safety of the general public." (*Eli v. Murphy*, *supra*, at pp. 599-600.)  The effectiveness of the PUC's regulatory authority necessarily would be impaired if the carrier were permitted to conduct business "by engaging independent contractors over whom it exercises no control.  If by the same device it could escape liability for the negligent conduct of its contractors, not only would the incentive for careful supervision of its business be reduced, but members of the public who are injured would be deprived of the financial responsibility of those who had been granted the privilege of conducting their business over the public highways." (*Id.* at p. 600.)  Accordingly, "both to protect the public from financially irresponsible contractors, and to strengthen safety regulations, it is necessary to treat the carrier's duties as nondelegable. . . .  [Citations.]" (*Ibid.*)  "Highway common carriers may not, therefore, insulate themselves from liability for negligence occurring in the conduct of their business by engaging independent contractors to transport freight for them." (*Id.* at p. 601.)

In *Serna*, *supra*, 110 Cal.App.4th 1475, the Court of Appeal applied *Eli* to reaffirm that the duty owed by motor carriers to safely operate vehicles on public highways is nondelegable.  There, the court held a motor carrier liable for the negligence of its driver, explaining as follows:  "[T]he rule is that a carrier who undertakes an activity (1) which can be lawfully carried on only under a public franchise or authority and (2) which involves possible danger to the public is liable to a third person for harm caused by the negligence of the carrier's independent contractor.  [Citations.]  Were the rule otherwise, a carrier could escape liability for the negligence of its independent contractors, thus reducing the incentive for careful supervision and depriving those who are injured of the financial responsibility of those to whom the privilege was granted. For these reasons, the carrier's duties are nondelegable . . . ." (*Serna*, *supra*, at p. 1486; see also *Gamboa v. Conti Trucking, Inc.* (1993) 19 Cal.App.4th 663 [motor carrier held liable to members of the public for harm caused by the negligence of the carrier's independent contractor].)

C.    *SeaBright Ins. Co. v. US Airways, Inc.*

In *SeaBright*, *supra*, 52 Cal.4th 590, the Supreme Court considered whether the *Privette* doctrine applied outside the peculiar risk context to a case alleging breach of a nondelegable duty under section 424 of the Restatement of Torts (precaution required by a statute or regulation). *SeaBright* arose out of an injury to an employee of an independent contractor hired by US Airways (USAir) to maintain and repair its airport luggage conveyor. The injury allegedly occurred because the conveyor lacked safety guards required by the California Occupational Safety and Health Act (Cal-OSHA) (Lab. Code, § 6300 et seq.). The independent contractor's insurer, SeaBright, paid workers' compensation benefits to the injured employee and then sued USAir, contending that the airline was responsible for the employee's injuries under the nondelegable duty doctrine because the duty to provide safety guards derived from a "statute or by administrative regulation." (*SeaBright*, at p. 596.) The trial court granted summary judgment for USAir, and the insurer appealed. (*Id.* at pp. 594-595.)

The Court of Appeal reversed, concluding that USAir's duty under Cal-OSHA to ensure that the conveyor had safety guards was nondelegable. (*SeaBright*, *supra*, 52 Cal.4th 590 at p. 595.) The Supreme Court disagreed and reinstated the grant of summary judgment. The court explained that unless the relevant statutes or regulations provide otherwise, a hirer is presumed to have delegated to an independent contractor any tort law duty it owes to the contractor's employees to ensure the safety of the workplace that is the subject of the contract. (*Id.* at p. 594 & fn. 1.) As relevant to the present case, Cal-OSHA did not indicate an intent to preclude delegation of the tort law duty the hirer owed to the independent contractor's employees. Thus, the court said, USAir had delegated to its independent contractor its tort duty to provide a safe workplace for the contractor's employees, and USAir was not vicariously liable for the employee's injury. (*Ibid.*)

14

**II.** **The Trial Court Erred in Concluding That Under *Privette*, *Tverberg*, and *SeaBright* a Hirer Can Never Be Vicariously Liability to an Independent Contractor**

The trial court's order granting summary judgment in the present case suggested that under *Privette*, *Tverberg*, and *SeaBright*, a hirer can *never* be liable for injuries to an independent contractor because "the duty to provide a safe working environment is implicitly and presumptively delegated in *all* independent contractor agreements." (Italics added.) FMI echoes this analysis on appeal, urging us to conclude that unless it was actively negligent, as a matter of law it cannot be liable to an individual hired by its independent contractor.

As posed by FMI's summary judgment motion, therefore, the initial question we must decide is whether the holdings of *Privette*, *Tverberg*, and *SeaBright* are as broad as FMI suggests—and, specifically, whether they hold collectively that a hirer can *never* be vicariously liable to an individual employed by an independent contractor. For the reasons that follow, we find that they do not.

*Privette* and *Tverberg* addressed claims arising under the doctrine of peculiar risk (Rest.2d Torts, § 416), and *SeaBright* addressed a claim that a statutory or regulatory duty to provide specified safeguards or precautions for the safety of others is nondelegable (Rest.2d Torts, § 424). *None* of these opinions addressed a claim under Restatement Second of Torts, section 428—i.e., that a hirer is liable for the torts of its independent contractor when conducting an activity "which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others"—and none purported to disapprove *Eli v. Murphy*, *supra*, 39 Cal.2d 598. (See *SeaBright*, *supra,* 52 Cal.4th at p. 600 ["The [nondelegable duties] doctrine applies when the duty preexists and does not arise from the contract with the independent contractor. (See *Eli v. Murphy*[, *supra*,] 39 Cal.2d 598, 600 . . . .")].)

Plaintiff's complaint squarely pleads a claim under section 428. It alleges: "Defendant FMI, Inc. . . . *was operating the vehicle under a public franchise* and was

15

subject to regulations enacted for the protection of the public (such as Plaintiff Vargas). *All Defendants, including FMI, Inc. and Eves Express, Inc. were under a nondelegable duty to Plaintiff* (and other members of the public) and so were liable for the negligence of Defendant Villalobos in seriously injuring Plaintiff . . . ." (Italics added.) Because the present case therefore asserts a theory of liability not addressed by the *Privette* line of cases, it is not governed directly by them. (E.g. *Felmlee v. Falcon Cable TV* (1995) 36 Cal.App.4th 1032, 1038 ["*Privette* does not purport to abolish all forms of vicarious liability in general, or the doctrine of nondelegable duty in particular, as a basis for suits by employees of contractors against the contractors' employer. Cases are not authority for propositions not discussed."].)

There are significant policy reasons for treating section 428 claims differently than section 424 claims. Section 424 is based on a duty arising out of a statute or regulation, and our Supreme Court has said that there is no reason to treat a hirer's vicarious liability for an independent contractor's breach of a statutory duty differently than its liability for an independent contractor's breach of a common law duty. (*SeaBright*, *supra*, 52 Cal.4th at p. 603 ["In sum, we see no reason to limit our holding in *Privette* simply because the tort law duty, if any, that the hirer owes happens to be one based on a statute or regulation."].) Section 428, however, is based not on a statutory duty generally, but on the grant of a public franchise or license. Public licenses generally require compliance with statutory or regulatory prerequisites, most often for the purpose of ensuring public safety. (E.g., *Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1299 [contractor's licensing law "has as its purpose to protect the public from incompetent and dishonest construction and building services, such that the law ' "provide[s] minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business." ' "]; *People v. Spence* (2005) 125 Cal.App.4th 710, 713, fn. 5 [drivers lacking a driver's license "pose a danger to public safety"]; *Gilbert v. City of San Jose* (2003) 114 Cal.App.4th 606, 608 [in issuing licenses,

16

Gambling Control Commission " 'shall consider whether issuance of the license is inimical to public health, safety, or welfare' "].) If the duties imposed on a public licensee could be delegated to a third party without any governmental oversight, a public licensing scheme would be meaningless because a licensee could avoid the responsibilities imposed by the license simply by engaging an independent contractor.

This is precisely the rationale on which the California Supreme Court relied in *Eli v. Murphy* to hold that a motor carrier could not avoid liability for motor vehicle accidents by retaining drivers who were independent contractors, rather than employees. The court explained: "C.M.T., operating as a highway common carrier, is engaged in a 'business attended with very considerable risk' [citations], and the Legislature has subjected it and similar carriers to the full regulatory power of the Public Utilities Commission to protect the safety of the general public. (Pub. Util. Code, §§ 213, 761, 762, 768, 1062.) The effectiveness of safety regulations is necessarily impaired if a carrier conducts its business by engaging independent contractors over whom it exercises no control. If by the same device it could escape liability for the negligent conduct of its contractors, not only would the incentive for careful supervision of its business be reduced, but members of the public who are injured would be deprived of the financial responsibility of those who had been granted the privilege of conducting their business over the public highways." (39 Cal.2d at pp. 599-600; see also *Snyder v. Southern Cal. Edison Co.* (1955) 44 Cal.2d 793, 801 [imposing vicarious liability on hirer for injury to independent contractor's employee under nondelegable duty doctrine: "Contrary to defendant's contention the statutes and rules of the commission do impose a direct and positive duty on the operator of a utility. . . . The rules were promulgated for the safety of workmen as well as the public, and civil penalties are imposed on the utility for failure to comply with them and criminal penalties are imposed on the officers and employees of the utility. Utilities may not operate except by permission of the commission which imposes the duties heretofore set forth together with other regulations pertinent to the operation of such organizations."].)

17

In any event, putting aside the significant differences between sections 424 and 428, the cases discussed above do not hold that the duty to provide a safe working environment is implicitly delegated in *all* independent contractor agreements. Although *SeaBright* holds that a hirer *presumptively* delegates to an independent contractor any tort law duties it owes to the contractor's employees to ensure workplace safety, it says that the presumption may be overcome if "*the relevant statutes or regulations indicate an intent to limit the application of Privette, supra, 5 Cal.4th 689, or preclude delegation of the tort law duty, if any, that the hirer owes to the contractor's employees.*" (*SeaBright*, *supra*, 52 Cal.4th at p. 594, fn. 1, italics added.) Our task, thus, is not to apply the *Privette* doctrine in *every* nondelegable duty case, but rather to review the pertinent statutes and regulations to determine whether they preclude the applicability of the *Privette* doctrine and prohibit delegation of the hirer's tort law duty in the particular case before us. The trial court therefore erred in concluding without further analysis that under *Privette*, *Tverberg*, and *SeaBright*, FMI is not vicariously liable to plaintiff as a matter of law.

### III. FMI Has Not Demonstrated That, as a Matter of Law, It Is Not Vicariously Liable to Plaintiff

Our conclusion that *Privette*, *Tverberg*, and *SeaBright* do not *categorically* exclude hirer liability does not end our inquiry. Instead, as we have said, we must consider the relevant statutes or regulations to determine whether they preclude the application of *Privette*, *supra*, 5 Cal.4th 689.

FMI's motion for summary judgment was silent regarding the "relevant statutes or regulations"—as is its respondent's brief, notwithstanding plaintiff's lengthy discussion of the issue. We could therefore conclude that FMI failed to show an entitlement to summary judgment and simply reverse on that basis. We decline to do so. Due to the significant issues presented, we address the complex federal statutory scheme that governs FMI's right to operate on the interstate highways, and specifically the statutory requirements that govern a motor carrier's control over its independent contractors.

18

A.	*The Federal Motor Carrier Act*

FMI, which operates as a motor carrier engaged in the movement of cargo, is subject to the Act and regulations promulgated thereunder, referred to as the Federal Motor Carrier Safety Regulations (regulations or FMCSR), 49 Code of Federal Regulations, part 300 et seq.[7]  Under the Act, a person may provide transportation as a "motor carrier"—i.e., "a person providing motor vehicle transportation for compensation" (49 U.S.C. § 13102(14))—only if "registered under this chapter to provide such transportation or service." (49 U.S.C. § 13901(a).)  To register a person as a motor carrier, the Secretary of Transportation (Secretary) must make a determination "that the person . . . is willing and able to comply with" a variety of regulations, including those governing control and financial responsibility (49 U.S.C. § 13902(a)(1)), as follows.

1.	Control

Under section 14101(a), a motor carrier "shall provide safe and adequate service, equipment, and facilities."  Although a motor carrier may provide such service through "motor vehicles not owned by it . . . under an arrangement with another party," the Secretary may require the motor carrier to make such arrangements in writing, "inspect the motor vehicles and obtain liability and cargo insurance on them," and "have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier." (49 U.S.C. § 14102(a)(1), (2), (4).)

Pursuant to section 14102, the Secretary has promulgated regulations that prohibit a motor carrier from fully delegating responsibility for the operation of motor vehicles to independent contractors.  The following list is not exhaustive, but describes some of the

---

[7]	California has adopted its own parallel regulatory scheme for motor carriers operating on state public highways, to which FMI is also subject.  (See Veh. Code, § 34600 et seq.)

ways in which the federal regulatory scheme requires motor carriers to maintain control over drivers and vehicles:

● A motor carrier may not "require or permit" a person to drive a commercial vehicle unless the person "[c]an, by reason of experience, training, or both, determine whether the cargo he/she transports . . . has been properly located, distributed, and secured." (49 C.F.R. § 391.13.)

● A motor carrier must conduct a road test of its drivers "of sufficient duration to enable the person who gives it to evaluate the skill of the person who takes it at handling the commercial motor vehicle, and associated equipment, that the motor carrier intends to assign to him/her." (49 C.F.R. § 391.31.)

● A motor carrier "shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle." (49 C.F.R. § 392.3.)

● No motor carrier shall "require or permit" a driver to be on duty while under the influence of specified drugs or substances. (49 C.F.R. § 392.4.)

● No motor carrier shall "require or permit a driver to" be under the influence of alcohol "within 4 hours before going on duty or operating, or having physical control of, a commercial motor vehicle." (49 C.F.R. § 392.5.)

● No motor carrier "shall schedule a run nor permit nor require the operation of any commercial motor vehicle between points in such period of time as would necessitate the commercial motor vehicle being operated at speeds greater than those prescribed by the jurisdictions in or through which the commercial motor vehicle is being operated." (49 C.F.R. § 392.6.)

● A motor carrier "may not require or permit a driver to operate a commercial motor vehicle unless . . . [the] cargo is properly distributed and adequately secured . . . [and the] vehicle's tailgate, tailboard, doors, tarpaulins, spare tire and other equipment

used in its operation, and the means of fastening the commercial motor vehicle's cargo, are secured." (49 C.F.R. § 392.9.)

● No motor carrier "shall permit or require" any driver to drive a commercial vehicle unless the driver has first taken 10 consecutive hours off duty, drives only during a period of 14 consecutive hours, and takes mandated rest breaks. (49 C.F.R. § 395.3.)

● Every motor carrier must "systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles and intermodal equipment subject to its control." (49 C.F.R. § 396.3.)

In addition to the above, the regulations also require motor carriers who transport property in leased vehicles to operate pursuant to written leases. These leases "shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease" and "shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease. . . ." (49 C.F.R. § 376.12.)

The reason for these requirements has been described as follows: " 'During the first half of the twentieth century, interstate motor carriers attempted to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying the drivers who operated the trucks as "independent contractors." [Citations.] In order to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators, Congress in 1956 amended the Interstate Common Carrier Act to require interstate motor carriers to assume full direction and control of the vehicles that they leased "as if they were the owners of such vehicles." [Citations.] The purpose of the amendments to the Act was to ensure that interstate motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants.' (*Morris v. JTM Materials, Inc*.

21

(Tex.App. 2002) 78 S.W.3d 28, 37-38, fn. omitted.)' " (*AmeriGas Propane, L.P. v. Landstar Ranger, Inc*. (2010) 184 Cal.App.4th 981, 994-995 (*AmeriGas*).)

        2.      <u>Financial responsibility</u>

The financial responsibility requirements applicable to motor carriers are set out in 49 United States Code section 13906, which provides that a motor carrier transporting property must obtain public liability insurance or other proof of financial responsibility in an amount prescribed by the Secretary, which "must be sufficient to pay. . . for each final judgment against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property." (49 U.S.C. § 13906(a)(1); see also 49 C.F.R. § 387.7(a) ["No motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility as set forth in" the regulations].) Under current law, minimum levels of financial responsibility are $750,000 for for-hire vehicles transporting nonhazardous materials, and $5,000,000 for for-hire vehicles transporting hazardous substances. (49 C.F.R. §§ 387.7, 387.9.)

The insurance endorsement required by the regulations (Form MCS-90) provides: "In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured *for public liability* resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." (49 C.F.R. § 387.15, italics added.) It defines "public liability" as "bodily injury, property damage, and environmental restoration," and "bodily injury" as "injury to the body, sickness, or disease *to any person*." (*Ibid*., italics added.) Finally, it excludes employees (but not independent contractors) from the scope of coverage: "Such insurance as is afforded, for public liability, does not apply to injury

22

to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo." (*Ibid*.)

The purpose of the financial responsibility requirement "is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." (49 C.F.R. § 387.1.)

B.      *The Weight of Federal and California Authority Holds That Motor Carriers Are Liable for Injuries to Drivers Classified as Independent Contractors*

While the statutes and regulations discussed above clearly evidence an intent to hold motor carriers liable for injuries caused by leased vehicles to *members of the public*, there is a split of authority among the federal circuits as to whether such liability also extends to *drivers of leased vehicles*. Although at least one circuit has found no liability, the better reasoned decisions, as well as the only California opinion to consider the issue, have held that motor carriers *are* liable to drivers of leased vehicles for the negligence of co-drivers or vehicle owners.

1.      Federal Authority

In *Proctor v. Colonial Refrigerated Transp., Inc.* (4th Cir. 1974) 494 F.2d 89 (*Proctor*), Colonial, a motor carrier, leased a tractor and driver from Bales, who then hired Proctor as an assistant driver. The tractor was involved in a collision with another truck, killing Bales and seriously injuring Proctor. Proctor sued Colonial, alleging that Colonial was vicariously liable for Bales's negligence. (*Id.* at p. 90.) The jury returned a verdict for Colonial, and Proctor appealed, contending that the trial court erred in instructing the jury that it must return a verdict for Colonial if it found that Bales was an independent contractor. (*Id.* at p. 90 & fn. 1.)

The Fourth Circuit reversed, holding that Colonial was liable to Bales's employee for injuries resulting from Bales's negligence. It explained: "As a certified interstate carrier Colonial was subject to the supervision and control of the Interstate Commerce

23

Commission,[8] and in augmenting its equipment through the lease agreement with Bales it was required to be in compliance with [the regulations]. These regulations and the statute under which they were promulgated require and provide that under such lease arrangements the lessee-carriers 'will have full direction and control of such [leased] vehicles and will be fully responsible for the operation thereof as if they were the owners of such vehicles.' [Fn. omitted.] These regulations were promulgated by the Commission to correct widespread abuses incident to the use of leased equipment by the carriers, [citation], and 'the intent [of the regulations] was to make sure that licensed carriers would be responsible in fact, as well as in law, for the maintenance of leased equipment and the supervision of borrowed drivers.' [Citation.] [Fn. omitted.] The statute and regulatory pattern clearly eliminates the independent contractor concept from such lease arrangements and casts upon Colonial full responsibility for the negligence of Bales as driver of the leased equipment. Any language to the contrary in the lease agreement would be violative of the spirit and letter of the federal regulations and therefore unenforceable." (*Proctor*, *supra*, 494 F.2d 89 at pp. 91-92.)

In so concluding, the court specifically rejected Colonial's contention that its obligation to the public did not extend to Proctor: "In the context of Colonial's responsibility under the Commission's regulations, Proctor was as much a stranger to Colonial as a shipper or a member of the traveling public, and to deny him recovery upon the independent contractor theory would undercut the primary purpose of the regulatory design." (*Proctor*, *supra*, 494 F.2d 89 at p. 92.)

The Fifth Circuit reached a contrary result in *White v. Excalibur Ins. Co.* (5th Cir. 1979) 599 F.2d 50. There, Superior, a motor carrier, entered a lease agreement with Crawford, under which Crawford agreed to provide Superior with trucks and drivers, and

---

[8]     In 1995, Congress abolished the Interstate Commerce Commission and transferred most of its responsibilities to the Secretary of Transportation. In 1999, Congress transferred responsibility for motor carrier safety within the Department of Transportation to the newly created Federal Motor Carrier Safety Administration. (*Department of Transportation v. Public Citizen* (2004) 541 U.S. 752, 759, fn. 1.)

further provided that the relationship between Superior and Crawford was one of employer/independent contractor. Crawford hired two drivers, Wright and Lindsey, to haul merchandise under the lease. While Lindsey was driving, the truck was involved in a collision, killing Wright. Wright's mother sued Lindsey and then attempted to collect the judgment from Superior's insurer. (*Id*. at pp. 51-52.)

The Fifth Circuit affirmed the district court's determination that Wright's mother could not recover. It found that Wright was neither an intended beneficiary of the statute nor a member of the public, and thus that federal law did not create a tort remedy for his survivors. The court explained: "Despite the lack of contractual agreement between the carrier and the lessor's employees, they cannot be considered strangers to the lessee, comparable, as the court in *Proctor* asserts, to members 'of the traveling public,' when engaged in operating a leased vehicle in the lessee's business. [Citation.] They stand apart not merely from other travelers but from all of the rest of the public who are not directly engaged in furthering the economic interest of the carrier and who are as a result made its responsibility under [the Act]. For the same reasons that we have concluded that Wright was not a member of the 'public' for purposes of [state law], we must also hold that he was not a member of the public for purposes of the applicability of federal substantive law created by [the Act] and must seek his remedy elsewhere." (*White*, *supra*, 599 F.2d at pp. 55-56.)

The Sixth Circuit followed *Proctor*, and rejected *White*, in *Johnson v. S.O.S. Transport* (6th Cir. 1991) 926 F.2d 516 (*Johnson*). There, a truck driver was killed while transporting a load of steel for defendant S.O.S. Transport, a motor carrier, in a truck owned by a third party. The driver's mother sued S.O.S., alleging that the accident was caused by defects in the truck's brakes. (*Id*. at p. 518.) The district court granted summary judgment for S.O.S., but the Sixth Circuit reversed, holding that the driver's mother had stated a claim against S.O.S. It explained that under federal law, interstate motor carriers transporting goods in leased vehicles are required to "have control of and be responsible for operating those motor vehicles." (*Id*. at p. 521.) Further, motor carrier

25

lease agreements "shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment during the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." (*Id*. at p. 521.) The court held it apparent from this language "that Congress intended that carriers who use leased equipment would be subjected to the same requirements, safety or otherwise, to which they would be subjected in using equipment owned by them. The statute mandates that the lessee carrier assume control over the vehicle, and bear responsibility, as it would if it were the owner, for any defects in the vehicle or negligence in its operation. [Fn. omitted.] Although the statute does not explicitly state *to whom* the lessee carrier must 'be responsible,' it also does not exclude operators from its protective coverage." (*Id*. at p. 523.)

The court further noted that the safety of the operators of vehicles was an express purpose of the Act: "A stated purpose of Chapter 34 is 'to minimize dangers to the health of operators of commercial motor vehicles[.]' 49 U.S.C. App. § 2501 (Supp. 1986). [Fn. omitted.] The chapter, which directs the Secretary of Transportation to establish and revise safety regulations pertaining to commercial trucks and buses (49 U.S.C. App. § 2505), [footnote omitted] is based upon a Congressional finding that 'enhanced protection of the health of commercial motor vehicle operators is in the public interest[.]' 49 U.S.C. App. § 2502 (Supp. 1986). . . . [¶] . . . [¶] . . . [Fn. omitted.] Thus, driver safety is expressly recognized as an important purpose of the regulatory design. We decline to thwart the fulfillment of that purpose by holding, as S.O.S. asks, that lessee carriers are not responsible when their failure to meet safety requirements results in the injury or death of a driver." (*Johnson*, *supra*, 926 F.2d at pp. 523-524.)[9]

---

[9] At oral argument, FMI's attorney contended that *Johnson* is irrelevant to this appeal because it addressed active negligence by the motor carrier, rather than vicarious liability. We do not agree. *Proctor*, *White*, and *Johnson* all considered an issue central to our analysis: Whether motor carriers are liable for on-the-job injuries *to their drivers* (as the drivers or their representative contended) or whether motor carrier liability is limited

26

## 2.  California Authority

In *AmeriGas*, *supra*, 184 Cal.App.4th 981, a California appellate court adopted the reasoning of *Proctor* and *Johnson* to hold that a motor carrier may be liable for injury to its driver.  In that case, AmeriGas contracted with Landstar, a motor carrier, to transport propane tanks.  Landstar leased a tractor and trailer from Steven King, through his company, King Transportation, pursuant to an independent contractor operating agreement.  While the propane tanks were being off-loaded, King was seriously injured. (*AmeriGas* at pp. 984, 985.)  King sued AmeriGas and other defendants for negligence and related torts; AmeriGas settled with King and cross-complained against Landstar for reimbursement of a portion of the settlement proceeds.  The trial court granted summary judgment for Landstar, and AmeriGas appealed, contending that Landstar's summary judgment motion failed to address AmeriGas's claim for relief under the Act.  (*Id*. at pp. 987-988.)

The Court of Appeal reversed the grant of summary judgment for Landstar.  After discussing the split among the federal circuits as to whether motor carriers are liable under the Act for injuries to drivers of leased trucks, it adopted the reasoning of *Johnson* to hold that that motor carriers *are* liable.  In so holding, it adopted the *Johnson* court's conclusion that the Act had two purposes:  "(1) '[T]o protect members of the public from motor carriers' attempts to escape liability for the negligence of drivers by claiming their drivers were independent contractors' [citation] and (2) 'to provide "enhanced protection of the health of commercial motor vehicle operators." ' [Citation.]"  (*AmeriGas*, *supra*, 184 Cal.App.4th at p. 997.)  Thus, the court said:  "As in *Johnson*, *supra*, 926 F.2d 516, in the instant case, we conclude King, as a driver, is an intended beneficiary of the

---

to members of the "motoring public."  Although the alleged cause of the driver's injuries in *Johnson* differed from the cause alleged here—*Johnson* alleged negligence by the truck owner, while *Proctor*, *White*, and the present case allege negligence by co-drivers—that distinction is not relevant to our analysis.

27

[regulations], and therefore AmeriGas can seek recovery against Landstar for violating regulations that caused or contributed to King's injury." (*Ibid.*)

        C.      *Analysis*

In light of the legal authority discussed above, and specifically the framework in *SeaBright* for determining delegation of responsibility and liability for acts of independent contractors, the key legal question before us is this: Does the Act indicate an intent to preclude delegation of the tort law duty that motor carriers owe to independent-contractor drivers? For the reasons that follow, we conclude that it does.

As we have said, central to the California Supreme Court's analyses in *SeaBright*, *Tverberg*, and *Privette* was the presumption of delegated control. *SeaBright* suggested that *Privette* and its progeny "recognize a presumption that an independent contractor's hirer *delegates* to that contractor the responsibility to perform the specified work safely." (*SeaBright*, *supra*, 52 Cal.4th at p. 602, italics added.) As a result, *SeaBright* said, the independent contractor, not the hirer, was liable to the independent contractor's employee for a worksite injury. *Tverberg* extended this analysis, holding that the general contractor was not vicariously liable for injuries to its subcontractor's independent contractor because "unlike a mere employee, [the independent contractor] receives authority to determine how the work is to be performed and assumes a corresponding responsibility to see that the work is performed safely." (*Tverberg*, *supra*, 49 Cal.4th at p. 528.) The court explained: "The independent contractor receives this authority over the manner in which the work is to be performed from the hirer by a process of *delegation*. . . . [W]hen the hirer of an independent contractor *delegates* control over the work to the contractor, the hirer also delegates 'responsibility for performing [the] task safely.' " (*Ibid.*, italics added.)

The predicate to the court's analyses in *SeaBright* and *Tverberg*, therefore, was its conclusion in each case that the hirers had delegated to their independent contractors authority over the manner in which the work was performed and responsibility for performing it safely. The present case is quite different, however.

28

*First*, the Act prohibits motor carriers from delegating to independent contractors the responsibility to safely operate vehicles on public highways. Indeed, as we have discussed, the Act and implementing regulations require motor carriers to carry out regular safety inspections, road-test their drivers, limit the number of hours drivers may operate a vehicle, and schedule deliveries at such time as will allow drivers to observe maximum speed limits, among other things. Moreover, the Act and regulations require that if a motor carrier transports goods in a leased vehicle, the lease must be in writing and "shall provide that the authorized carrier lessee shall have *exclusive possession, control, and use of the equipment* for the duration of the lease" and "shall further provide that the authorized carrier lessee shall assume *complete responsibility for the operation of the equipment* for the duration of the lease. . . ." (49 C.F.R. § 376.12, italics added.) Consistent with this regulation, the lease between FMI and Suchite provided: "In accordance with the requirements of the Federal Highway Administration, Department of Transportation Regulations, we [FMI] shall have exclusive possession, control, and use of the equipment for the duration of the agreement; and we assume complete responsibility for the operation of the equipment for the duration of the agreement. . . ." This language, which is consistent with federal law, is facially *inconsistent* with the conclusion that FMI delegated to Suchite, Villalobos, and plaintiff complete authority over the manner in which the cross-country haul was performed and responsibility for performing it safely.

*Second*, the regulations require motor carriers to maintain liability insurance or other proof of financial responsibility in an amount sufficient to pay a final judgment for "bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles" in order to "create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles

29

operated on public highways." (49 U.S.C. § 13906(a)(1), 49 C.F.R. § 387.15.)[10] *Nothing* in the regulations suggests that a motor carrier's financial responsibility does not extend to its independent contractors. To the contrary, the insurance endorsement required by the regulations covers, among other things, "injury to the body, sickness, or disease *to any person*." (49 C.F.R. § 387.15, italics added.) Although the endorsement further provides that "[s]uch insurance as is afforded, for public liability, does not apply to injury to or death of the insured's *employees* while engaged in the course of their employment, or property transported by the insured, designated as cargo," it does not contain a similar exclusion for the insured's independent contractors. (*Ibid*., italics added.)

*Third*, the best reasoned federal circuit court decisions, as well as the only California case to have considered the issue, have held in cases arising directly under the Act that motor carriers are liable for injuries to their independent contractor's drivers. In so concluding, these courts have noted both that the Act "does not exclude operators from its protective coverage" and that "driver safety is expressly recognized as an important purpose of the regulatory design. (*Johnson v. S.O.S. Transport*, *supra*, 926 F.2d at pp. 523-524; *Proctor v. Colonial Refrigerated Transp., Inc.*, *supra*, 494 F.2d 89; see also *AmeriGas*, *supra,* 184 Cal.App.4th at p. 1001 ["It is apparent that the intent of the Act and FMCSR is to protect drivers, regardless of whether they are employees or independent contractors under state law, and to hold carriers accountable for FMCSR violations resulting in harm to drivers . . . ."].)[11]

*Fourth*, the presumption in *Tverberg* that the independent contractor "receives authority to determine how the work is to be performed and assumes a corresponding

---

**10**     Consistent with this requirement, FMI carried a Motor Carrier Policy of Insurance for Public Liability, with limits of $2,000,000 per accident.

**11**     Of course, these cases are not directly applicable because the sole cause of action in the present case is for common law negligence, not a violation of the Act. Nonetheless, the Act is highly relevant to our analysis because FMI's tort law duty, if any, to plaintiff "is one derived . . . from a statute" such that the statute "establish[es] the existence of a tort law duty of care." (*SeaBright*, *supra*, 52 Cal.4th at p. 597.)

responsibility to see that the work is performed safely" (*Tverberg*, *supra*, 49 Cal.4th at p. 709) is inapplicable in a case like the present one, where the injured driver was, by design, *asleep* at the time of the accident. Federal law permits motor carriers to employ two-person driving teams so that the movement of cargo is not halted while a driver sleeps. In such circumstances, the Act requires each driver to spend at least 10 hours "off-duty" in the vehicle's sleeper berth. (49 C.F.R. §§ 395.1(g), 395.3.)[12] It is illogical to suggest that a driver can or should be responsible for ensuring his own safety during hours that he is neither in the cab nor, indeed, awake.

Taken together, these statutory and regulatory provisions are clear that although a motor carrier may act through an independent contractor driving a leased vehicle, the motor carrier retains ultimate responsibility for the vehicle's safe operation—and, in the event of an accident, for satisfying a judgment "for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property." (49 U.S.C. § 13906(a)(1).) Construing these provisions, as FMI suggests, to allow the motor carrier to delegate to independent contractors the duty to safely operate vehicles on public highways, runs contrary to the plain language of these provisions and to the public policy expressed in the Act. We therefore conclude that the trial court erred in finding that FMI is not vicariously liable to plaintiff for Villalobos's negligence and in granting summary judgment on that basis.

---

[12]     FMI concedes it "caused two drivers, Plaintiff and Villalobos, to be dispatched . . . to drive the cargo *in shifts* from San Pedro, California to New Deptford, New Jersey." (Italics added.)

31

**[[APPEAL—JUDGMENT FOR EVES EXPRESS**

In opposition to the summary judgment motion, plaintiff asserted that Eves, the tractor owner, was vicariously liable for Villalobos's negligence pursuant to Vehicle Code section 17150, which provides: "Every owner of a motor vehicle is liable and responsible for death or injury to person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or otherwise, by any person using or operating the same with the permission, express or implied, of the owner."

Eves responded that Vehicle Code section 17150 is preempted by the Graves Amendment, 49 United States Code section 30106(a), which provides:

"(a) In general. An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if—

"(1) the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and

"(2) there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner)."

We do not find that Eves has demonstrated that the Graves Amendment applies to the present case. In support of its summary judgment motion, Eves presented evidence that it leased the tractor to FMI under a written lease, but it presented no evidence that it was "engaged in the trade or business of renting or leasing motor vehicles"—or, indeed, that it leased any motor vehicles other than the tractor involved in this case. Significantly, Eves's separate statement of undisputed facts stated that it leased the tractor at issue to FMI, but it included no undisputed facts regarding being in the trade or business of renting or leasing motor vehicles.

In our view, the fact that Eves leased a tractor on one occasion does not establish as a matter of law that it "is engaged in the trade or business of renting or leasing motor vehicles" (49 U.S.C. § 30106(a)) within the meaning of the Graves Amendment. The use of the plural term "motor vehicles" suggests that, at a minimum, an owner must rent or lease more than one motor vehicle in order to be entitled to protection under the statute.[13] Liberally construing the evidence in favor of plaintiff as the party opposing summary judgment, as we must, we conclude that Eves has failed to show that the Graves Amendment applies. Eves therefore failed to negate its liability for negligence, and it therefore is not entitled to summary judgment.]]

**[[ End nonpublished portion ]]**

---

[13] Beyond this observation, we need not decide the precise meaning of the quoted statutory language, and we need not decide any other issue concerning the applicability of the Graves Amendment in these circumstances.

## DISPOSITION

The judgments and orders granting summary judgment for FMI and Eves are reversed. Plaintiff is awarded his costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**.


EDMON, P. J.

We concur:


KLEIN, J.[*]


KITCHING, J.

---

[*] Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.