Filed 3/13/23  Rafferty v. Del Monte Foods, Inc. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| AMANDA RAFFERTY, etc., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>DEL MONTE FOODS, INC.,<br><br>Defendant and Respondent. | F082233<br><br>(Super. Ct. Nos. 9000526<br>& 2130792)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Walkup, Melodia, Kelly & Schoenberger, Khaldoun A. Baghdadi, Joseph Nicholson; Bogan Law Firm, Tai C. Bogan; Law Offices of Tiffany J. Gates, Tiffany J. Gates; Law Offices of Sanjay Schmid and Sanjay Schmidt for Plaintiffs and Appellants.

Borbely & Associates, Ronald F. Berestka, Jeffery A. Chadic and Thomas E. Borbely for Defendant and Respondent.

-ooOoo-

Del Monte Foods, Inc. (Del Monte) hired J.M. Equipment Company, Inc. (J.M. Equipment) to clean and repair its air powered dock levelers.  While David Rafferty (Rafferty), an employee of J.M. Equipment, was performing repair work on a dock

leveler at Del Monte, the leveler's platform fell on him and crushed him to death. Rafferty's wife, Amanda Rafferty, and his minor daughter, Addison Rafferty, by and through her guardian ad litem, Dorothy Patscheck (collectively, plaintiffs), sued Del Monte for his wrongful death, alleging Del Monte was responsible for the safe condition of the dock leveler, yet it failed to undertake promised safety measures or train and supervise its employees in the dock leveler's safe operation.

Del Monte moved for summary judgment on the ground plaintiffs' claims were barred by the *Privette* doctrine (as set forth in *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and subsequent cases), under which the hirer of an independent contractor is not liable for on-the-job injuries to the contractor's employees unless some exception applies. The trial court granted summary judgment, rejecting plaintiffs' argument Del Monte could be liable to them under the nondelegable duty exception, which applies when the hirer breaches nondelegable statutory or regulatory duties in a manner that affirmatively contributes to the employee's injury. Because we conclude there are triable issues of fact as to whether Del Monte is liable to plaintiffs under a nondelegable duty theory, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Del Monte leased a large property in Modesto, on which sits several warehouses and the facility Del Monte used to package, can, store, and ship fruit products. In April 2014, Del Monte's landlord agreed to replace six dock levelers in Warehouse 4 of the Del Monte facility and hired a general contractor to install the new levelers. A specialty contractor, who the general contractor hired to perform the installation, installed six Nova Technology air-powered dock levelers (dock levelers) at Warehouse 4 in July 2014.

The dock levelers are operated using a raise button on a control panel. When the button is pressed, an air bag under the dock leveler's platform or plate inflates, causing the platform to rise; when the platform reaches a certain level, the lip on the platform's front extends and the dock leveler reaches its full height. When the button is released, the

2.

air bag deflates, and the platform lowers until the extended lip rests on the truck bed. For cleaning and maintenance purposes, the dock levelers include a maintenance prop arm with a lockout pin which supports the platform in a raised position. To perform maintenance under the platform, the platform must be raised by inflating the air bags, and the maintenance prop arm placed behind the front header plate; once the prop is in place, it bears the platform's weight, and the air bags are deflated. Unless the dock leveler is equipped with a tethered remote, two people are required to engage the maintenance prop—one person to operate the leveler and the other to engage the maintenance prop.

The owner/user's manual for the dock leveler contains several warnings and cautions for servicing the dock leveler. It warns that hydraulic and electrical power must be off when servicing the equipment and, for maximum protection, to use an OSHA-approved locking device to lock out all power sources, with only the person servicing the equipment having the key. It cautions to always post safety warnings and barricade the work area at dock and ground level to prevent unauthorized use of the unit before maintenance is complete. It also cautions to place the maintenance prop "in the upright 'service' position" when working under the dock leveler and to always "lock all electrical disconnects in the OFF position after raising the platform and engaging the maintenance prop." Moreover, since 2015, the manufacturer has recommended using additional means to support the dock platform and lip when physically working in front of or under the dock leveler, such as a boom or fork truck, or stabilizing bar.

***Del Monte Hires J.M Equipment Company to Maintain the Dock Levelers***

Randy Reeder, a Del Monte forklift supervisor, was responsible for hiring companies to maintain the dock levelers. Reeder did not work on the dock levelers himself. Rather, Del Monte hired companies to periodically inspect and maintain the dock levelers. According to Reeder, Del Monte employees never inspected or maintained the dock levelers.

In early 2016, Reeder wanted to hire an independent dock leveler maintenance contractor to replace the one Del Monte had been using. Reeder spoke with Robert John (RJ) Days about Day's company, J.M. Equipment, performing dock leveler maintenance at the Del Monte warehouse, and they agreed J.M. Equipment would perform quarterly cleaning and maintenance, which would start in May. As a condition of J.M. Equipment's dock leveler maintenance, Reeder advised Days that Del Monte required J.M. Equipment to: (1) use two employees for dock leveler maintenance; (2) have its employees sign in at the Del Monte facility's front gate; and (3) have its employees check in with Reeder whenever they came on the property. Reeder did not give Days manuals or technical or service bulletins from the manufacturer concerning the dock levelers. He also did not provide a written lockout/tagout plan or any lockout/tagout information.

Days, however, did not recall any conversation with Reeder about any specific safety policies that applied to the dock levelers at the Del Monte facility including lockout or tagout procedures. Darren Costa, who was a J.M. Equipment employee, recalled only one conversation with Reeder in which Reeder confirmed they were there to make minor adjustments to the springs while servicing the docks; Reeder never mentioned having a hazardous energy control procedure (HEC procedure) that applied to contractors. Costa denied having a custom and practice of checking in with Reeder while working at Del Monte.

Rafferty and Costa began the dock leveler maintenance in May 2016. While they previously performed dock leveler maintenance elsewhere and had worked on dock levelers with airbags, they had never worked on this brand of dock leveler. They checked in with Reeder when they came to the facility, but they did not finish servicing all the dock levelers. No one at Del Monte told them how to perform the maintenance work, direct the means or methods of their work, or supervise their work, and Costa and Rafferty controlled the safety procedures associated with that work. They relied on J.M. Equipment to provide the lockout/tagout equipment they needed.

4.

While performing preventative maintenance on the dock levelers, Costa and Rafferty noticed some welds on the levelers at Warehouse 4 were cracked.  Although the levelers were still operational, Costa reported to Days the need for repairs, which work exceeded the scope of the maintenance contract.  After Days spoke with Reeder about the cracked welds, Reeder inspected the cracks and recommended his supervisor to authorize J.M. Equipment to make the repairs.

*The Accident*

Del Monte authorized the repair work, but a written purchase order was not issued until June 23, 2016.  It was nearly summer, which was the busiest time of year at the Del Monte facility and having repair work done on the dock levelers would have been disruptive to Del Monte's business.  Before the formal, written work order was issued, Reeder called Days to ask the status of "this work" since the busy season was coming.  Reeder testified he did not call specifically about the welding work, but rather he called about the completion of services on the docks, as they had two more warehouses to do.

Rafferty went to Del Monte to perform repair work on June 15, 2016.  Rafferty did not sign in on the Del Monte visitor's log or check in with Reeder, who did not know a J.M. Equipment mechanic was working on the dock levelers that day.  Rafferty worked on about two or three of the dock levelers at Warehouse 4.  To independently raise the dock platforms and engage the maintenance prop arms, Rafferty used a metal nut and duct tape to activate the control button and raise the dock platforms, which allowed him to raise the maintenance prop and place it under the lip outside the header bars to prop open the dock platform.

Del Monte employees Dennis Wasson and Rudy Garcia, who were working in Warehouse 4 that day, saw some dock doors open at Warehouse 4 and a truck with "JM" insignia parked in front of the docks.  Garcia heard music in the vicinity of the docks, but neither man had contact with the person working on the dock platforms at that time.

About an hour and a half later, Wasson and Garcia were starting their 6:00 p.m. lunch break when they decided Garcia would check on the J.M. Equipment mechanic to see how long he would be there and if he needed anything. Garcia discovered the mechanic, Rafferty, pinned under the dock platform at Dock N. Garcia immediately notified Wasson and they called 911. Rafferty was pronounced dead at the scene; the cause of death was determined to be a crush injury to the chest.

J.M. Equipment's workers compensation carrier, Starstone National Insurance Co., paid over $650,000 in workers compensation benefits to Rafferty's widow, Amanda, for his accidental death.

### This Lawsuit

In April 2018, plaintiffs filed a complaint against Del Monte, among other defendants, and alleged causes of action for negligence and premises liability against Del Monte. Del Monte answered the complaint with a general denial and asserted several affirmative defenses, including that it did not breach any duty owed to plaintiffs under *SeaBright Ins. Co. v. U.S. Airways, Inc.* (2011) 52 Cal.4th 590 (*SeaBright*).

### Del Monte's Summary Judgment Motion

Del Monte filed its motion for summary judgment in August 2020, asserting plaintiffs' claims were barred by the *Privette* doctrine, as it did not exercise any control over Rafferty's work in a manner that affirmatively contributed to his death. Specifically, Del Monte argued it was not liable for the accident because, as in *SeaBright*, it implicitly delegated to J.M. Equipment any duty to provide J.M. Equipment's employees a safe workplace, including any duty based on Cal-OHSA regulations. Del Monte contended any statutory or regulatory duty it may have had to provide lockout/ tagout procedures or any other safety procedures applicable to the maintenance of the dock levelers was delegable and was implicitly delegated to J.M. Equipment as an incident of its work on the dock levelers. Del Monte further argued the retained control exception to the *Privette* doctrine did not apply, as it did not retain control over Rafferty's

6.

work, and any control it did retain was not exercised in a manner that affirmatively contributed to his death.

*Plaintiffs' Opposition*

Plaintiffs opposed the motion on several grounds. They argued the *Privette* presumption may be overcome if the relevant statutes or regulations indicate an intent to limit *Privette*'s application or preclude delegation of a tort law duty the hirer owes the independent contractor's employees. Plaintiffs asserted the plain language of California Code of Regulations, title 8, section 3314[1] evinces a clear intent to preclude Del Monte from delegating its duty to develop an HEC procedure specific to dock levelers and to instruct outside contractors on the procedure's purpose and use.

Plaintiffs argued Del Monte's failure to address section 3314 in its moving papers warranted denial of Del Monte's motion but, in any event, triable issues of fact existed as to whether Del Monte breached its nondelegable duties under section 3314 and whether such breach was a substantial factor in causing Rafferty's death. In support, plaintiffs presented evidence that Del Monte did not have written HEC procedures for dock levelers, and Del Monte's employees were not trained in the lockout or tagout of dock levelers. Alternatively, plaintiffs argued triable issues of fact existed as to whether Del Monte negligently exercised retained control over Rafferty's work in a manner that affirmatively contributed to his death.

*Del Monte's Reply*

In reply, Del Monte asserted the provisions of section 3314 were delegable, and it did not owe Rafferty a duty to have an HEC procedure, because section 3314 imposes a duty to promulgate an HEC procedure only when the employer's employees perform maintenance and repair on heavy equipment such as levelers, and Del Monte's employees never performed such work. Instead, J.M. Equipment was the employer of employees

---

[1] Further undesignated section references are to this title.

7.

who engaged in repairing and servicing the levelers; therefore, J.M. Equipment was required to provide an HEC procedure for its employees. Del Monte also argued any tort law duties it may have owed Rafferty relating to the levelers were delegable to J.M. Equipment when Del Monte contracted with J.M. Equipment to perform maintenance and repair on the levelers.

***The Trial Court Grants Summary Judgment***

At the conclusion of oral argument on the motion, the trial court took the matter under submission and subsequently issued a written order granting the motion and entering judgment in Del Monte's favor. The trial court found that under *Seabright*, "any tort law duty Del Monte may have had was delegated to J.M. Equipment." The trial court acknowledged "[t]he hirer of an independent contractor can be liable if the hirer retained control over the contractor's work and exercised it in a way that affirmatively contributed to the employee's workplace injury," but found there was no evidence Del Monte exercised control over the work in a way that affirmatively contributed to Rafferty's death. The trial court determined the fact Del Monte did not review with or provide an HEC procedure to J.M. Equipment did not raise a triable issue of fact, as Del Monte did not have a right of control over J.M. Equipment's work. The trial court also determined Del Monte's specification that two J.M. Equipment employees perform service on the dock levelers did not equate to retaining control over the work or raise an issue of fact, as Del Monte did not have an opportunity to enforce the specification since it was undisputed Rafferty failed to check in with Reeder.

## DISCUSSION

### I.      The *Privette* Doctrine

The "workers' compensation scheme 'is the exclusive remedy against an employer for injury or death of an employee.' " (*Privette*, *supra*, 5 Cal.4th at p. 697.) In *Privette*, the Supreme Court held that " 'an independent contractor's employee should not be allowed to recover damages from the contractor's hirer, who "is indirectly paying for the

8.

cost of [workers' compensation] coverage, which the [hired] contractor presumably has calculated into the contract price." ' " (*Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 640 (*Alvarez*).)  Thus, the *Privette* doctrine bars an employee of an independent contractor from recovering damages from the hirer of the contractor for a worksite injury.  (*SeaBright*, *supra*, 52 Cal.4th at p. 594.)  In other words, an independent contractor's employee injured on the job is generally entitled to no greater damages than a similarly situated employee of the hirer—both are limited to workers' compensation benefits.

Over time, our Supreme Court has "recast [the] primary rationale for the *Privette* doctrine in terms of delegation rather than workers' compensation."  (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 270 (*Sandoval*); *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 41 ["[o]ur more recent cases emphasize delegation as the key principle underlying this rule"].)  Since contractors typically are expected to perform the contracted work more safely than hirers, the Supreme Court has "endorsed a 'strong policy' of presuming that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor."  (*Sandoval*, *supra*, 12 Cal.5th at p. 270.)  As a result, "[t]here is a strong presumption under California law that a hirer of an independent contractor delegates to the contractor all responsibility for workplace safety."  (*Gonzalez*, at p. 37; *Sandoval*, at p. 271 ["[a] presumptive delegation of tort duties occurs when the hirer turns over control of the worksite to the contractor so that the contractor can perform the contracted work"].)

The *Privette* doctrine has exceptions, however, which "apply where delegation is either ineffective or incomplete."  (*Sandoval, supra,* 12 Cal.5th at p. 271.)  The exception for the latter situation—the retained control exception—applies when "the hirer retains control over any part of the work and actually exercises that control so as to affirmatively contribute to the worker's injury."  (*Sandoval*, *supra*, 12 Cal.5th at p. 271, citing *Hooker*

9.

*v. Department of Transportation* (2002) 27 Cal.4th 198, 202 (*Hooker*).)[2] "If a hirer entrusts work to an independent contractor, but *retains* control over safety conditions at a jobsite and then negligently exercises that control in a manner that affirmatively contributes to an employee's injuries, the hirer is liable for those injuries, based on its own negligent exercise of that retained control." (*Tverberg v. Fillner Construction, Inc.* (2012) 202 Cal.App.4th 1439, 1446.)

A form of the retained control exception applies when the hirer breaches nondelegable statutory or regulatory duties in a manner that affirmatively contributes to the employee's injury.[3] (*Khosh v. Staples Construction Co., Inc.* (2016) 4 Cal.App.5th 712, 717, 719–721 (*Khosh*); *Padilla v. Pomona College* (2008) 166 Cal.App.4th 661, 673 (*Padilla*).) As the Supreme Court explained in *SeaBright*, appellate courts generally have concluded a hirer's statutory or regulatory duties regarding workplace safety "constitute retained control if those duties are nondelegable," in which case hirer liability exists if the hirer's breach of nondelegable duties affirmatively contributes to the injury of the independent contractor's employee. (*SeaBright*, *supra*, 52 Cal.4th at p. 601.) A statutory or regulatory duty is nondelegable if the applicable statutes or regulations either indicate an intent to limit the application of *Privette* or preclude delegation of any tort law duty the hirer owes the independent contractor's employees. (*SeaBright*, at p. 594, fn. 1.)

---

**2** Delegation is ineffective when there is a concealed hazard, which exception applies when a landowner-hirer fails to disclose to the independent contractor a concealed hazard, i.e., a hazard the hirer knows or reasonably should know exists and that the contractor does not know exists and could not reasonably discover without the hirer's disclosure. (*Sandoval*, at pp. 271–272.) This exception is not at issue in this case.

**3** "The nondelegable duties doctrine prevents a party that owes a duty to others from evading responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work. The doctrine applies when the duty preexists and does not arise from the contract with the independent contractor." (*SeaBright*, *supra*, 52 Cal.4th at pp. 600–601.)

Unless the statutory or regulatory duties are nondelegable, however, the "hirer implicitly delegates to the contractor any tort law duty it owes *to the contractor's employees* to ensure the safety of the specific workplace that is the subject of the contract[,]" including "any tort law duty the hirer owes to the contractor's employees to comply with applicable statutory or regulatory safety requirements." (*SeaBright*, *supra*, 52 Cal.4th at p. 594 & fn. 1.)

In *SeaBright*, the defendant airline hired an independent contractor to maintain and repair its baggage conveyor, but the conveyor lacked safety guards required by certain Cal-OSHA regulations (i.e., Lab. Code, § 6300 et seq. [Cal. Occupational Safety & Health Act of 1973 (Cal-OSHA) ]; §§ 3999, 4002). (*SeaBright*, *supra*, 52 Cal.4th at pp. 594–595.) An employee of the independent contractor was injured while inspecting the conveyor and sued the airline for negligence and premises liability. (*Ibid.*) In opposing the airline's summary judgment motion based on *Privette*, the employee presented a declaration from an accident reconstruction expert who stated the lack of safety guards violated Cal-OSHA regulations and the safety guards would have prevented the employee's injury. (*SeaBright*, *supra*, 52 Cal.4th at p. 595.)

The court concluded any tort law duty a hirer owes to an independent contractor's employees under Cal-OSHA and its regulations is delegable. (*SeaBright*, *supra*, 52 Cal.4th at p. 601.) The court reasoned that when the airline hired the independent contractor to maintain and repair the conveyor, the airline "presumptively delegated to [the contractor] any tort law duty of care the airline had under Cal-OHSA and its regulations to ensure workplace safety for the benefit of [the contractor]'s employees," which "included a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard." (*SeaBright*, *supra*, 52 Cal.4th at p. 601.)

The court explained the issue was whether the airline implicitly delegated to the contractor any tort law duty it had to ensure workplace safety for the *contractor's*

11.

*employees*, which duty did not predate the airline's contract with the contractor, but rather arose out of it. (*Seabright*, *supra*, 52 Cal.4th at p. 603.) Since any tort law duty the airline owed the contractor's employees only existed because of the maintenance and repair work the contractor was performing for the airline, it did not fall within the nondelegable duties doctrine. (*Ibid.*) Accordingly, the injured employee could not recover in tort from the airline on a theory the employee's workplace injury resulted from the airline's breach of what the employee described as a nondelegable duty under Cal-OSHA regulations to provide safety guards on the conveyor. (*Ibid.*)

## II.     The Standard of Review

A trial court properly grants summary judgment when there are no triable issues of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.)

"In evaluating the propriety of a grant of summary judgment our review is de novo, and we independently review the record before the trial court." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925, fn. omitted.) We may affirm the judgment "on any correct legal theory, provided the opposing party had the opportunity to address it below." (*Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 821.) In our review "we must consider all of the evidence and all of the inferences reasonably drawn therefrom, and we must view such evidence in the light most favorable

12.

to the opposing party." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) This means we accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385.) "A material issue of fact may not be resolved based on inferences, if contradicted by other inferences or evidence." (*Alexander v. Codemasters Group Limited*, at p. 139.) " '[T]he court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact,' but must determine the question of law of 'what any evidence or inference *could show or imply to a reasonable trier of fact.*' " (*Ibid.*)

"[A] defendant moving for summary judgment is ' "entitled to the benefit of any relevant presumptions…." ' " (*Alvarez, supra*, 13 Cal.App.5th at p. 642.) A presumption affecting the burden of producing evidence shifts the burden on summary judgment to the opposing party to show there are triable issues of material fact. (*Ibid.*, citing *Security Pacific National Bank v. Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179–180.) If the established facts and relevant presumption entitle the defendant to a directed verdict at trial, the defendant is entitled to summary judgment. (*Security Pacific National Bank v. Associate Motor Sales*, at p. 180.) Thus, where the defendant establishes the presumption applies and the plaintiff offers no evidence to contradict the presumption, the presumption justifies a summary judgment. (*Ibid.*)

In *Alvarez*, the appellate court concluded the *Privette* presumption affects the burden of producing evidence; therefore, a moving defendant need only show it is entitled to the benefit of the presumption to shift the burden of proof to the opposing plaintiff to show there are triable issues of fact. (*Alvarez, supra*, 13 Cal.App.5th at pp. 643–644.) Once the defendant hirer establishes the foundational facts for the *Privette* presumption to apply—that the defendant hired the plaintiff's employer to perform work on the jobsite and the plaintiff was injured while working at the site—the burden shifts to

13.

the plaintiff to raise a triable issue of material fact. (*Alvarez*, at p. 644.) The plaintiff may do so by presenting evidence that an exception to *Privette* may apply. (*Alvarez*, at pp. 644–646.) The burden of persuasion, however, remains with the party moving for summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851.) We view the evidence in a light favorable to the plaintiff, as the nonmoving party, "liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

## III. Del Monte's Burden

Del Monte met its initial burden to show it is presumptively entitled to the benefit of the *Privette* doctrine. Del Monte provided evidence that it hired Rafferty's employer to perform cleaning, maintenance, and repair work on the dock leveler, and Rafferty was injured while working at the site. That is all that is required for Del Monte to shift to plaintiffs the burden to produce evidence raising a triable issue of fact as to the applicability of an exception to the *Privette* doctrine. (*Alvarez*, *supra*, 13 Cal.App.5th at p. 644; *Degala v. John Stewart Co.* (2023) 88 Cal.App.5th 158, 167.)

Plaintiffs nevertheless contend Del Monte failed to meet its initial burden because it did not address the nondelegable duty exception to *Privette* or section 3314 in its moving papers.[4] But under *Alvarez*, no such showing is required. (*Alvarez*, *supra*, 13 Cal.App.5th at p. 644.)[5] Plaintiffs assert *Alvarez* is not controlling because they

---

[4] While Del Monte did not mention section 3314 in its moving papers, it did argue that any duty it may have had under Cal-OSHA regulations to provide lockout or tagout procedures applicable to maintenance of the dock levelers was delegable and was implicitly delegated to J.M. Equipment.

[5] Plaintiffs cite *Vargas v. FMI, Inc.* (2015) 233 Cal.App.4th 638 in support of their argument that Del Monte was required to address section 3314 in its moving papers. While the appellate court noted in *Vargas* that it could conclude the defendant failed to show it was entitled to summary judgment and reverse on that basis because the defendant's motion was "silent regarding the 'relevant statutes or regulations,' " as was

14.

explicitly put the nondelegable duty exception at issue by (1) identifying the duty in the complaint, and (2) repeatedly invoking the exception and identifying section 3314 as the specific source of the alleged nondelegable duty in their discovery responses. They argue under those circumstances, Del Monte bore the initial burden of producing evidence that would require a reasonable trier of fact to find the exception does not apply.

This argument ignores that it is the operative complaint that determines the issues a defendant must address to prevail on a summary judgment motion; therefore, a moving defendant need address only the issues raised by the complaint. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258.) It also ignores the rationale asserted in *Alvarez* for requiring a defendant moving for summary judgment to submit evidence establishing the foundational facts of the *Privette* presumption, rather than requiring the defendant to show an exception to the presumption does not apply. As the *Alvarez* court explained, once the presumption is shown, the trier of fact must assume the existence of the presumed fact until evidence is introduced to support a finding of its nonexistence; therefore, on summary judgment a moving party need only show entitlement to the benefit of the presumption to shift the burden of proof to the opposing party to show there are triable issues of fact. (*Alvarez*, *supra*, 13 Cal.App.5th at p. 644.) This rationale applies regardless of whether the complaint pleads the existence of an exception to *Privette* or the plaintiff's reliance on an exception is revealed in subsequent discovery responses.

## IV.    The Nondelegable Duty Exception to the *Privette* Doctrine

Plaintiffs contend they raised a triable issue of fact as to whether the nondelegable duty exception to *Privette* doctrine applies. They argue section 3314 imposes a

---

its respondents' brief, it declined to do so due to the significant issues presented. (*Id.* at p. 654.) The *Vargas* court, however, did not address the effect of the *Privette* presumption on the moving defendant's initial burden on summary judgment. We believe *Alvarez* is the better reasoned decision and follow it here.

nondelegable duty on Del Monte to develop an HEC procedure for the dock leveler, which outside service personnel must follow when servicing the dock leveler, and to instruct designated employees on the procedure, which duties Del Monte breached by not having such a procedure and not training its employees on it. Plaintiffs further argue these breaches affirmatively contributed to Rafferty's death, as the absence of a procedure intended to protect employees and contractors from potential injury would be expected to result in a contractor being injured or killed while servicing the leveler.

### A. *Nondelegable Duty*

As noted in *SeaBright*, in considering whether a duty is nondelegable, the test is whether "the relevant statutes or regulations indicate an intent to limit the application of *Privette* ... or preclude delegation of the tort law duty, if any, that the hirer owes to the contractor's employees." (*SeaBright*, *supra*, 52 Cal.4th at p. 594, fn. 1; see *Vargas*, *supra*, 233 Cal.App.4th at p. 662 [the test is whether the statute "indicate[s] an intent to preclude delegation of the tort law duty"].)[6] The court also recognized a duty is nondelegable when it "preexists and does not arise from the contract with the independent contractor." (*SeaBright*, *supra*, 52 Cal.4th at p. 601.)

It is necessary to consider the regulation in question to determine whether the duty or duties created by it were intended to be nondelegable. (*Padilla*, *supra*, 166 Cal.App.4th at p. 673.) Section 3314 "applies to the cleaning, repairing, servicing, setting-up and adjusting of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." (§ 3314, subd. (a)(1).) To prevent inadvertent movement or the release of stored energy during cleaning, servicing, and adjusting operations, the

---

[6] In *Vargas*, the court concluded the relevant duties in that case were nondelegable because the statutory and regulatory provisions at issue prohibited carriers from delegating to independent contractors the responsibility to safely operate vehicles on public highways. (*Vargas*, *supra*, 233 Cal.App.4th at pp. 654, 662–664.)

regulation requires machinery or equipment capable of movement to "be stopped and the power source de-energized or disengaged" and, if necessary, the mechanical blocking or lock out of movable parts. (*Id.*, subd. (c).) If the machinery or equipment must be capable of movement to perform the specific task, the employer is required to minimize the hazard by providing and requiring the use of extension tools or other methods or means to protect employees from injury. (*Id.*, subd. (c)(1).) When performing repair work and setting-up operations, "[p]rime movers, equipment, or power-driven machines" that have lockable or readily lockable controls must "be locked out or positively sealed in the 'off' position," but if not so equipped, positive means must be taken which will effectively prevent inadvertent movement or release of stored energy, such as de-energizing or disconnecting the equipment from its power source. (*Id.*, subd. (d).) During all operations, accident prevention signs or tags must be placed on the controls of the power source of the machinery, equipment, or prime movers. (*Id.*, subds. (c) & (d).)

Employers are required to develop procedures to control hazardous energy: "A hazardous energy control procedure shall be developed and utilized by the employer when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment." (§ 3314, subd. (g).)[7] The employer's HEC procedure must "be documented in writing," and "include separate procedural steps for the safe lockout/tagout of each machine or piece of equipment affected by the hazardous energy control procedure." (*Id.*, subd. (g)(2)(A).) "Whenever outside servicing

---

[7]     The procedure must "clearly and specifically outline the scope, purpose, authorization, rules, and techniques to be utilized for the control of hazardous energy, and the means to enforce compliance, including but not limited to, the following:  [¶] (A) A statement of the intended use of the procedure; [¶] (B) The procedural steps for shutting down, isolating, blocking and securing machines or equipment to control hazardous energy; [¶] (C) The procedural steps for the placement, removal and transfer of lockout devices and tagout devices and responsibilities; and, [¶] (D) The requirements for testing a machine or equipment, to determine and verify the effectiveness of lockout devices, tagout devices and other hazardous energy control devices." (§ 3314, subd. (g)(1).)

personnel are to be engaged in activities covered by [section 3314], the on-site employer's lockout or tagout procedures shall be followed." (*Id.*, subd. (k).)

Employers also must train its employees concerning the HEC procedure. As applicable here, an "affected employee" who operates or uses a machine or equipment on which cleaning, repairing, servicing, setting-up or adjusting operations are being performed under lockout or tagout, or works in an area in which such operations are being performed under lockout or tagout, must "be instructed in the purpose and use of the energy control procedure." (§ 3314, subds. (b) & (*l*)(2).) All other employees who may work in the area where HEC procedures may be utilized must "be instructed about the prohibition relating to attempts to restart or reenergize machines or equipment which are locked out or tagged out." (*Id.*, subd. (*l*)(3).)

The parties do not dispute that section 3314 applies to dock levelers. Plaintiffs assert Del Monte was required to have a written HEC procedure specific to dock levelers and to instruct its affected employees in its use. Plaintiffs contend these duties are nondelegable because: (1) they exist regardless of whether Del Monte hires an independent contractor to service or repair the dock levelers; (2) only Del Monte can ensure the procedure exists and is followed by employees and contractors; and (3) outside contractors have no ability to ensure Del Monte's employees know how to conduct themselves when the dock leveler is being locked or tagged out so they do not inadvertently defeat the mechanisms in place.

### 1. Del Monte is Required to Develop an HEC Procedure for the Levelers

We first address whether Del Monte was required to develop an HEC procedure for the dock levelers when it intends for only independent contractors to clean, repair, service, set up or adjust them. Del Monte contends it was not required to do so because this duty exists only if Del Monte's employees perform the enumerated activities on the dock levelers, which according to Del Monte never happens. Del Monte reasons that

18.

since it was not required to have an HEC procedure, the regulation could not impose a nondelegable duty, and the exception cannot apply.

To support this interpretation, Del Monte cites section 3314, subdivision (g): "A hazardous energy control procedure shall be developed and utilized by the employer when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment." Del Monte asserts the phrase "when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment" modifies both the immediately preceding verb "utilized" and the more remote verb "developed"; therefore, it was only required to develop an HEC procedure if its employees engaged in those operations.

Plaintiffs, however, argue the latter phrase modifies only the immediately preceding verb; therefore, the regulation requires the employer to develop an HEC procedure when the listed operations will be performed on "machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees" (§ 3314, subd. (a)(1)), regardless of who performs those operations. This dispute requires us to interpret the regulation.

" '[T]he interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute.' " (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 477; accord, *Auchmoody v. 911 Emergency Services* (1989) 214 Cal.App.3d 1510, 1517.) When interpreting the regulation, our "fundamental" task is to "ascertain the intent of the agency issuing the regulation so as to effectuate the purpose of the law." (*Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021.) "To determine that intent, we turn first to the words of the regulation, giving effect to the usual meaning of the language used, while avoiding an interpretation which renders any language mere surplusage. [Citation.] When statutory language is clear, we must apply that language without indulging in interpretation." (*Ibid.*) However, " ' " ' "[l]iteral

19.

construction should not prevail if it is contrary to the legislative intent apparent in the [statute] ….” ’ ” ’ ” (*Sanchez v. State of California*, at p. 477.)

The issue here is whether the last phrase of section 3314, subdivision (g) concerning employees engaging in enumerated operations modifies only the phrase “utilized by the employer” or also modifies the words “be developed.” In discerning the most reasonable interpretation of section 3314, subdivision (g), we apply the last antecedent rule, which provides that “ ‘ “qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.” ’ ” (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743, quoting *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 (*White*).) Under that interpretive rule, the phrase “when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment” modifies only the phrase “utilized by the employer.” The regulation’s punctuation provides further support for this interpretation, as the qualifying phrase “when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment” is not set off from the preceding terms by a comma. (*White*, *supra*, 31 Cal.3d at p. 680 [evidence that a qualifying phrase applies to all antecedents rather than only the immediately preceding one “may be found in the fact that it is separated from the antecedents by a comma”].)

There are two exceptions to the last antecedent rule, neither of which is applicable here. The first exception “provides that when several words are followed by a clause that applies as much to the first and other words as to the last, ‘ “ ‘the natural construction of the language demands that the clause be read as applicable to all.’ ” ’ ” (*Renee J.*, *supra*, 26 Cal.4th at p. 743.) The phrase “when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment” does not necessarily apply equally to the words “be developed” as such an interpretation would negate another subsection of the regulation, section 3314, subdivision (k), which

20.

provides that when "outside servicing personnel are to be engaged in activities covered by this section, the on-site employer's lockout or tagout procedures shall be followed."  If an employer were required to develop an HEC procedure only when its employees perform the enumerated activities, this subsection would be meaningless, as there would be no procedures for the outside servicing personnel to follow.  Therefore, the pertinent phrase does not apply equally to the development and utilization of the HEC procedure.

The second exception "provides that '[w]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding wo[r]ds …, [its application] will not be restricted….'  [Citations.]  This is, of course, but another way of stating the fundamental rule that a court is to construe a statute ' "so as to effectuate the purpose of the law." ' "  (*White*, *supra*, 31 Cal.3d at p. 681.)  In this case, the "sense" of section 3314 does not require the application of the phrase "when employees are engaged in the cleaning, repairing, servicing, setting-up or adjusting of prime movers, machinery and equipment" to both the development and utilization of the HEC procedure, as the purpose of section 3314 is to protect both employees and outside servicing personnel from the unexpected energization or start-up of machines or equipment that could cause injury.

Moreover, as plaintiffs assert, Del Monte's proposed interpretation would effectively negate the training requirements imposed by section 3314 when an employer uses outside servicing personnel to perform service and repairs on machines or equipment that are covered by the regulation.  (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["[a]n interpretation that renders related provision nugatory must be avoided"].)  As set out above, employees whose job requires them to operate or use a machine or equipment, or work near a machine or equipment, that is being cleaned, repaired, serviced, set up, or adjusted under lockout or tagout are required to be "instructed on the purpose and use of the energy control procedure."  (§ 3314, subds. (b) & (*l*)(2).)  In addition, employees "whose work operations may be in an area where energy control procedures may be

21.

utilized" must be instructed not to attempt to restart or reenergize machines or equipment that are locked or tagged out. (*Id*., subd. (*l*)(3).)

The purpose of these training requirements is to ensure the on-site employer's employees do not inadvertently defeat whatever hazardous energy control devices or methods are in place while the machine is being cleaned, repaired, serviced, set up, or adjusted, whether the work is being performed by the on-site employer's employees or outside servicing personnel. But if an employer who hires only outside servicing personnel to perform the enumerated activities, such as Del Monte, does not have a duty to develop an HEC procedure, there would not be a procedure on which to train its employees and those employees would have no idea how to safely work around the machine or equipment when it is locked out or tagged out. Del Monte's interpretation of section 3314 would effectively eliminate the training requirement and defeat the overarching intent of section 3314 to prevent or minimize the risk of injury during the repair or maintenance of dangerous machines such as dock levelers.

In sum, Del Monte was required to develop its own HEC procedures for the dock levelers and to train its employees on that procedure.

### 2. Del Monte's Duties Extend to Employees of Independent Contractors

Del Monte argues that even if it had a duty to develop an HEC procedure, it only owed that duty to its own employees, not to employees of independent contractors who are servicing or repairing the dock levelers. Section 3314, however, provides that the on-site employer's HEC procedure must be followed by its own employees and "outside servicing personnel" who are engaged in activities covered by the section. (§ 3314, subds. (g) & (k).) Thus, an on-site employer's HEC procedure is intended to ensure the safety of both its own employees and the employees of independent contractors. Moreover, the on-site employer's duty to train its own employees in the purpose and use of the HEC procedure exists regardless of whether the on-site employer's employees or

outside personnel are performing the activities covered by section 3314 and evidences an intent to protect both employees and outside personnel.

Citing *SeaBright*, *supra*, 52 Cal.4th at page 603, Del Monte asserts while it may have owed a duty to its own employees to have an HEC procedure before J.M. Equipment was hired, it did not owe a duty to J.M. Equipment and its employees until the contract for servicing the dock levelers was created; therefore, as in *SeaBright*, any duty it owed Rafferty only existed because of the work J.M. Equipment was performing and did not fall within the nondelegable duties doctrine. *SeaBright*, however, is distinguishable, as the two Cal-OSHA regulations that were at issue there are unlike section 3314, as neither explicitly contemplate the protection of "outside servicing personnel" in addition to protecting the on-site employer's employees. (See *SeaBright*, *supra*, 52 Cal.4th at p. 595, citing §§ 3999, 4002 [regulations governing conveyor safety].) Moreover, the duty to develop an HEC policy and train its employees did preexist the contract with J.M. Equipment, as Del Monte was required to develop the HEC procedure and train its employees on it regardless of whether an independent contractor was being hired to service the dock levelers.

In sum, section 3314 evinces an intent to protect the on-site employer's employees as well as outside servicing personnel. Consequently, any duties Del Monte owed under section 3314 are owed to both its own employees and employees of its independent contractors.

### 3. Section 3314 Evinces an Intent to Preclude Delegation

Del Monte argues that even if it owed a duty to develop an HEC procedure for the dock levelers, which extended to both its own employees and employees of its independent contractors, that duty was presumptively delegated to J.M. Equipment when it hired J.M. Equipment to perform maintenance and repairs on the dock levelers. While Del Monte acknowledges there may be cases in which the relevant regulations indicate an

23.

intent to limit *Privette*'s application or preclude delegation of any tort law duty the hirer owes the contractor's employees, Del Monte insists this is not the case here.

Del Monte argues implicit delegation occurs when the Cal-OSHA regulation or other statutory duty is designed to protect workers from harm created by a specific task and that task is contracted out to an independent contractor.[8] But that is too broad a brush here. As plaintiffs argue, by requiring "outside servicing personnel" engaged in the enumerated activities to follow the on-site employer's lockout or tagout procedures, section 3314 contemplates that even if Del Monte hires an independent contractor to service the dock levelers, it still owes a duty to the independent contractor and its employees to have an HEC procedure in place and to train Del Monte's employees to follow it. This makes this regulation different than the regulations and statutes in the cases Del Monte cites, as it evinces an intent to preclude delegation of an on-site employer's duty to develop a machine-specific HEC procedure.

As we have noted, Del Monte's duty to develop an HEC procedure and train affected employees concerning it preexists any contract that Del Monte might enter into with an independent contractor to service the dock levelers, and both must occur even if

---

**8** In support, Del Monte cites cases that determined any duty owed the contractor's employee under Cal-OSHA regulations was delegable to the contractor because the regulation pertained to workplace safety for the specific work the contractor was hired to perform. (*SeaBright*, *supra*, 52 Cal.4th at pp. 595, 603 [Cal-OSHA regulations requiring guards on luggage conveyor delegable to conveyor repair contractor]; *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1090–1091 & fn. 4 [Cal-OSHA regulations, California statutes, and municipal code requiring building owners to install structural roof anchors for use by window washers delegable to window washing contractor; court noted there was no indication of intent to preclude delegation]; *Khosh*, *supra*, 4 Cal.App.5th at pp. 719–720 [Cal-OHSA regulation requiring supervision of high voltage systems and National Fire Protection Association (NFPA) Standard requiring written lockout/tagout procedures for electrical system delegable to contracted electrician]; *Padilla*, *supra*, 166 Cal.App.4th at pp. 671–673 [Cal-OSHA regulation requiring utilities/water to be shut off, capped or controlled before demolition work delegable to demolition contractor].)

24.

Del Monte never hires an independent contractor.[9]  Thus, like the regulation found to be nondelegable in *Evard v. Southern California Edison* (2007) 153 Cal.App.4th 137 (*Evard*), which required the billboard owner to provide standard guardrails (*id.* at p. 146), section 3314 imposes duties that only Del Monte can fulfill.  (See *Padilla*, *supra*, 166 Cal.App.4th at p. 673 [noting the regulation in *Evard* imposed a permanent obligation on the owner with respect to the property's condition that only the landowner was able to ensure].)

Del Monte asserts delegating any duty concerning the HEC procedure to J.M. Equipment is preferable because J.M. Equipment, as a business that professionally services dock levelers, is in a superior position to develop safety protocols for their maintenance and repair.  (See *Sandoval*, *supra*, 12 Cal.5th at p. 279 [it is preferable to discourage hirer involvement in contracted work since "we presume the contractor is best situated to prevent contract worker injury given its relative proximity to the work, superior expertise and resources, ability to internalize costs, and relationship with the workers"].)

But as plaintiffs point out, while J.M. Equipment may have more general knowledge on how to maintain and repair dock levelers than Del Monte, this does not make J.M. Equipment an expert on every brand of dock leveler, as shown by Costa's testimony that while he and Rafferty had done similar work on dock levelers, he had never worked on the brand of dock leveler that was in Del Monte's warehouse.  Del Monte possessed the manufacturer's manual for the dock levelers, which provides clear instructions on how to safely service them.  Moreover, Del Monte knew how to develop

---

[9]     For this reason, section 3314 is distinguishable from the NFPA Standard found delegable in *Khosh*, which provided "that 'all complex lockout/tagout procedures shall require a written plan of execution that identifies the person in charge.' "  (*Khosh*, *supra*, 4 Cal.App.5th at p. 719.)  While the NFPA Standard required a written procedure for lockout/tagout, it apparently did not require outside contractors to follow that procedure or require training of the on-site employer's employees, as section 3314 does.

25.

an HEC procedure, as it adopted a general HEC procedure, although it was not specific to dock levelers,[10] which was required under section 3314. (See *In re Eel River Sawmills, Inc.* (Cal. OSHA App. Bd., Sept. 3, 2003, No. 00-R2D3-3623) 2003 CA OSHA App. Bd. LEXIS 95, pp. *4-*13 [§ 3314 requires machine-specific energy control procedures].)

Further, Del Monte ignores its training obligations under section 3314, which is meant to ensure Del Monte's employees will not inadvertently release stored energy while the dock levelers are being repaired or serviced. If we accept Del Monte's logic, this training duty, like the duty to develop an HEC procedure, would be presumptively delegated to J.M. Equipment upon hiring. J.M. Equipment, however, is not in a position to train Del Monte's employees, as it has no control over them.

In sum, the duties Del Monte owed under section 3314 to develop a detailed, written HEC procedure for the dock levelers and instruct its affected employees in the purpose and use of the procedure were nondelegable. Del Monte does not dispute that if such duties existed and were nondelegable, they were breached in this case.

### B.      *Affirmative Contribution*

Even if a duty is found to be nondelegable, a hirer is not liable for injury to a contractor's employee unless the hirer's breach of that nondelegable duty affirmatively contributed to the employee's injury. (*Khosh*, *supra*, 4 Cal.App.5th at pp. 720–721; *Padilla*, *supra*, 166 Cal.App.4th at p. 673.) Plaintiffs assert a trier of fact could conclude Del Monte's breach of its nondelegable duties to develop an HEC procedure for the dock

---

**10**      Notably, the general HEC procedure stated it applied "to the control of hazardous energy during all service and maintenance activities whether performed by Del Monte employees or outside contractors at the Modesto facility." It further provides that all contractors must be familiar with the procedure, Del Monte's chief engineer or project manager is responsible for reviewing the program with the contractor before contracted work begins, and on request, the contractor will be given a copy of the procedure to share with the contractor's employees. Moreover, Del Monte's employees affected by the outside contractor's lockout program must be informed of the work and program deviations before the contractor begins work.

levelers and instruct its affected employees affirmatively contributed to Rafferty's death. Del Monte responds that the lack of an HEC procedure is at most an omission to correct a potentially unsafe condition, which is not actionable.

Our Supreme Court recently addressed the affirmative contribution element in the context of the retained control exception in *Gonzalez* and *Sandoval*. In *Gonzalez*, the court held that a landowner is not liable to an independent contractor or its workers for an injury resulting from a known hazard on the premises unless the "landowner retains control over any part of the contractor's work and negligently exercises that retained control in a manner that affirmatively contributes to the injury." (*Gonzalez*, *supra*, 12 Cal.5th at pp. 38–39.) In so holding, the court noted that following its decision in *Hooker*, *supra*, 27 Cal.4th 198, which established the retained control exception to *Privette*, "courts have consistently reaffirmed that '[a] hirer's failure to correct an unsafe condition' is insufficient, by itself, to establish liability under *Hooker*'s exception to the *Privette* doctrine." (*Gonzalez*, at p. 46.) Instead, "[t]o be liable, a hirer must exercise its retained control over any part of the contracted-for work … in a manner that affirmatively contributes to the injury." (*Id.* at pp. 46–47.)

The court further explained the element of affirmative contribution in *Sandoval*: " 'Affirmative contribution' means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury. [Citation.] Where the contractor's conduct is the immediate cause of injury, the affirmative contribution requirement can be satisfied only if the hirer in some respect induced—not just failed to prevent—the contractor's injury-causing conduct. [Citations.] It is not enough for the hirer's exercise of control to incidentally give the hirer the *opportunity* to prevent the contractor's injury-causing conduct. [Citation.] [¶] A hirer's conduct also satisfies the affirmative contribution requirement where the hirer's exercise of retained control contributes to the injury independently of the contractor's contribution (if any) to the injury." (*Sandoval*, *supra*, 12 Cal.5th at p. 277.)

27.

The *Sandoval* court stated the critical factor was the relationship between the hirer's conduct and contractor's conduct, and "neither 'actual exercise' nor 'affirmative contribution' requires that the hirer's *negligence* (if any) consist of an affirmative act. The hirer's negligence may take the form of any act, course of conduct, or failure to take a reasonable precaution that is within the scope of its duty under *Hooker*." (*Sandoval*, *supra*, 12 Cal.5th at p. 277.) Affirmative contribution is a different inquiry than substantial factor causation, as "affirmative contribution does not itself require that the hirer's contribution to the injury be substantial." (*Id.* at p. 278.) "If a plaintiff proves that the hirer actually exercised retained control in a way that affirmatively contributed to the contract worker's injury, the plaintiff establishes that the hirer owed the contract worker a duty of reasonable care as to that exercise of control." (*Ibid.*)

Plaintiffs assert that under this test for affirmative contribution, a trier of fact could conclude Del Monte's breach of its nondelegable duties to develop a written HEC procedure for the dock levelers and instruct its affected employees in the purpose and use of the procedure affirmatively contributed to Rafferty's death. Plaintiffs assert because there is no evidence to suggest J.M. Equipment, or its employees, were the immediate cause of Rafferty's death,[11] the issue is whether Del Monte's breach of its nondelegable duties contributed to Rafferty's death independent of any other factor that may have played a role in his death. Plaintiffs argue a trier of fact reasonably could infer Del Monte's failure to develop an HEC procedure for the dock levelers contributed to Rafferty's death because "the entire purpose" of having such a procedure "is to prevent or, at the very least, significantly mitigate the risk of injury or death to an employee or contractor in the event stored energy is unexpectedly released while the leveler is being cleaned, repaired, serviced, set up, or adjusted."

---

[11] While there is evidence Rafferty used a metal nut and duct tape to activate the control button, raise the dock platform, and put the maintenance prop in place, there is no evidence this caused the platform to fall.

Del Monte responds the affirmative contribution is not met here because the failure to develop an HEC procedure for the dock levelers was at most a passive omission. In support, Del Monte cites *Khosh,* in which the appellate court concluded "[t]he absence of a work plan or a supervisor did not affirmatively contribute to [the plaintiff]'s injuries," because the hirer's breach of its regulatory duties was, at most, a "passive omission" that did not constitute an affirmative contribution. (*Khosh*, *supra*, 4 Cal.App.5th at pp. 718, 721; see *Gonzalez*, *supra*, 12 Cal.5th at pp. 46–47 ["courts have consistently reaffirmed that '[a] hirer's failure to correct an unsafe condition,' is insufficient, by itself, to establish liability under *Hooker*'s exception to the *Privette* doctrine"]; *Hooker*, *supra*, 27 Cal.4th at p. 215 [hirer did not affirmatively contribute to death of contractor's employee where hirer's safety personnel were aware of an unsafe practice and failed to exercise their retained authority to correct it]; *Delgadillo v. Television Center, Inc.*, *supra*, 20 Cal.App.5th at pp. 1092–1093 [failure to provide safety equipment does not constitute affirmative contribution as the "passive provision of an unsafe workplace" is not actionable].)

But as our Supreme Court recognized in *SeaBright*, there is a split of authority on whether a hirer's breach of a nondelegable statutory or regulatory duty can satisfy the affirmative contribution requirement where, as here, the breach is an omission.[12] (*SeaBright*, *supra*, 52 Cal.4th at p. 601.) In *Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, the appellate court determined there was a triable issue of fact as to whether a hirer's failure to provide fire extinguishers within 75 feet of its fuel storage tanks, in breach of its nondelegable duty under the California Fire Code,

---

[12] The court did not resolve the split in *SeaBright*; instead, it concluded the regulatory duties at issue in that case were delegable. (*SeaBright*, *supra*, 52 Cal.4th at p. 601.) The split was not resolved in either *Sandoval* or *Gonzalez*, neither of which involved the nondelegable duty exception. (*Sandoval*, *supra*, 12 Cal.5th at pp. 264–265; *Gonzalez*, *supra*, 12 Cal.5th at pp. 37–39.)

29.

affirmatively contributed to the plaintiff's injuries sustained when one of the tanks exploded while he was working nearby.  (*Id.* at pp. 298–299.)  Similarly, in *Evard*, *supra*, 153 Cal.App.4th 137, the appellate court concluded there was a triable issue of fact as to whether a billboard owner's failure to provide standard guardrails, a horizontal safety line, or to ensure the employee's safety belt or harness lanyard was secured to a ladder, in breach of its nondelegable duty under the California Code of Regulations, affirmatively contributed to the plaintiff's injuries sustained when he received an electrical shock while replacing an advertisement on the billboard and fell to the ground.  (*Id.* at pp. 147–148.)

Although both *Barclay* and *Evard* involved omissions, the omissions affirmatively contributed to the plaintiff's injuries because, had the hirers complied with their statutory or regulatory duties, the plaintiffs may not have been injured.  For example, in *Barclay*, had a fire extinguisher been nearby when the explosion occurred it could have been used to extinguish the flames sooner, thereby reducing the severity of the plaintiff's injuries.  (*Barclay*, *supra*, 129 Cal.App.4th at p. 299.)  And in *Evard*, the failure to provide guardrails and lack of safety line, and to assure the plaintiff's safety belt or harness lanyard was secured to a ladder, allowed the plaintiff to fall when he received a shock from the electrical power line.  (*Evard*, *supra*, 153 Cal.App.4th at p. 148.)

As in *Barclay* and *Evard*, there is an issue of fact as to whether Del Monte's omission, i.e., its failure to develop an HEC procedure for the dock levelers, affirmatively contributed to Rafferty's death.  As plaintiffs point out, had Del Monte developed a proper HEC procedure for the dock levelers, it would necessarily have included "[t]he procedural steps for shutting down, isolating, blocking and securing [the dock levelers] to control hazardous energy" and "[t]he requirements for testing [the dock levelers] to determine and verify the effectiveness of lockout devices, tagout devices and other hazardous energy control devices." (§ 3314, subd. (g)(1)(B) & (D).)  In addition, since 2015, both the manufacturer and American National Standards Institute have recommended the use of additional means to support the dock platform and lip whenever

30.

someone is working in front of or under the dock leveler. It can reasonably be inferred that if these procedures had existed and were followed, Rafferty would more likely than not have been able to work safely under the dock leveler's platform without being crushed. Affirmative contribution also can reasonably be inferred because Rafferty sustained the precise injury section 3314 was intended to prevent.

Del Monte suggests it could not have affirmatively contributed to Rafferty's death because Rafferty did not comply with Del Monte's requests to sign in at the entrance, he failed to notify Reeder he would be working on site, and he performed maintenance without a partner, which required him to use a nut and duct tape to raise the platform. Del Monte asserts it was "[s]ome aspect of this rigged solo process [that] apparently failed—as such fixes are wont to do—and he was tragically killed."

But as plaintiffs assert, this is just conjecture, as there is no evidence as to what precipitated the platform falling and crushing Rafferty to death. Del Monte claims it was Rafferty's improper placement of the maintenance prop bar in front of the dock plate header that caused the rod to slip and the platform to collapse on him, citing Costa's testimony that in a photograph of a dock leveler shown to him, the maintenance prop was incorrectly placed so it may be able to slide off the plate. Del Monte, however, does not point to any evidence that this was the state of the dock leveler Rafferty was working on when he was killed, and Costa did not opine the improper placement of the maintenance prop was the cause of Rafferty's accident.[13]

---

[13] Plaintiffs objected to Costa's testimony in the trial court on the grounds it lacked foundation and constituted an improper lay opinion. Since the trial court did not rule on these objections, we presume the objections have been overruled, with the objector having the burden to renew its objections on appeal. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Although plaintiffs state in their reply brief that they renew their objections here, they do not present any reasoned argument as to why their objections are meritorious and therefore have forfeited the argument. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [we may treat a point as waived where the appellant fails to support it with reasoned argument and citations to authority].)

31.

Del Monte suggests that even if it had developed an HEC procedure for the dock levelers, Rafferty would not have followed it, since Rafferty ignored Del Monte's "basic requests" to sign in at the front gate, check in with Reeder, and to work in pairs. Even if these policies existed, there is no evidence they were ever communicated to Rafferty or that he was aware of them. At most, the evidence establishes these policies were communicated to Days, who was J.M. Equipment's contact with Del Monte. Moreover, Costa testified it was not his custom and practice to check in with Reeder when performing work at Del Monte, which strongly suggests these policies were communicated only to Days.

Thus, a trier of fact reasonably could infer that if Rafferty did not follow Del Monte's policies, it was because he was unaware of them, not because he was someone who disregarded requests made by the on-site employer. Even if it is fair to speculate Rafferty would have ignored Del Monte's HEC procedure for the dock levelers had it been given to him, "[n]onetheless, 'considering the totality of the evidence, we believe a rational trier of fact could reasonably conclude' " Rafferty would have followed any HEC procedures given to him; therefore, the lack of an HEC procedure affirmatively contributed to Rafferty's death. (*Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1139.)

In sum, when the evidence and all inferences reasonably drawn therefrom are viewed in the light most favorable to plaintiffs, a trier of fact reasonably could conclude Del Monte's breach of its nondelegable duties under section 3314 affirmatively contributed to Rafferty's death. Since plaintiffs succeeded in raising triable issues of material fact on the elements of the nondelegable duty exception to the *Privette* doctrine, we conclude a trial is necessary to resolve those disputes and plaintiffs are entitled to their day in court.

## **DISPOSITION**

The judgment is reversed.  Costs on appeal are awarded to plaintiffs.


                                                DE SANTOS, J.

WE CONCUR:


MEEHAN, Acting P. J.


SNAUFFER, J.